**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

MOISES MENDEZ,                     :

                                 :

                       Plaintiff,     :            08 Civ. 4967 (CM)

                                 :

            v.                   :

                                 :

STARWOOD HOTELS & RESORTS    :

WORLDWIDE, INC.,                :

                                 :

                    Defendant.   :

-------------------------------------------------------------- x

## PLAINTIFF'S BRIEF ADDRESSING WHY THE VERDICT ON RACIAL/NATIONAL ORIGIN DISCRIMINATION IS AGAINST THE WEIGHT OF THE EVIDENCE

THOMPSON WIGDOR & GILLY LLP

Kenneth P. Thompson
Ariel Y. Graff
85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
*kthompson@twglaw.com*
*agraff@twglaw.com*

*COUNSEL FOR PLAINTIFF*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................................... 1

STATEMENT OF FACTS .................................................................................................................... 1

    I.  HOSTILE WORK ENVIRONMENT CREATED AND CONDONED BY
        SUPERVISORS AND MANAGERS AT THE HOTEL ................................................... 3

        A.  Enforcement of Discriminatory No-Spanish in the Workplace Policies.............. 5

    II.  HOSTILE WORK ENVIRONMENT AND HARASSMENT BY CO-WORKERS ...................... 6

        A.  Discriminatory Statements ................................................................................ 6

        B.  Threats of Violence........................................................................................10

        C.  Discriminatory Notes and Pornography .......................................................11

    III.  FAILURES AND INDIFFERENCE OF HUMAN RESOURCES DEPARTMENT...................12

ARGUMENT........................................................................................................................................17

    I.  HOSTILE WORK ENVIRONMENT – CITY HRL...............................................................18

        A.  Legal Standards...............................................................................................18

        B.  Application .......................................................................................................19

    II.  HOSTILE WORK ENVIRONMENT –
        TITLE VII, SECTION 1981 AND STATE HRL..............................................................21

        A.  Legal Standards...............................................................................................21

        B.  Application .......................................................................................................23

CONCLUSION....................................................................................................................................26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alfano v. Costello*,
   294 F.3d 365 (2d Cir. 2002) .......................................................................22

*Brewster v. City of Poughkeepsie*,
   447 F. Supp. 2d 342 (S.D.N.Y. 2007) ................................................. 20, 22

*Burlington Indus. v. Ellerth*,
   524 U.S. 742 (1998) .................................................................................23

*Cruz v. Coach Stores, Inc.*,
   202 F.3d 560 (2d Cir. 2000) .......................................................................22

*Gorzynski v. JetBlue Airways Corp.*,
   596 F.3d 93 (2d Cir. 2010) .......................................................................23

*Howley v. Town of Stratford*,
   217 F.3d 141 (2d Cir. 2000) .......................................................................22

*King v. Interstate Brands Corp.*,
   No. 02-cv-5470 (JFB/RML),
   2009 U.S. Dist. LEXIS 36594 (E.D.N.Y. Apr. 29, 2009) ..............................24

*La Grande v. DeCrescente Distrib. Co*,
   Nos. 08-3010-cv/09-1789-cv,
   2010 U.S. App. LEXIS 5925 (2d Cir. Mar. 23, 2010) ..................................24

*Levitant v. City of N.Y. Human Res. Admin.*,
   625 F. Supp. 2d 85 (E.D.N.Y. 2008) ...........................................................20

*Manley v. Ambase Corp.*,
   337 F.3d 237 (2d Cir. 2003) .......................................................................17

*Nat'l R.R. Passenger Corp. (AMTRAK) v. Morgan*,
   536 U.S. 101 (2002) .................................................................................17

*Perry v. Ethan Allen, Inc.*,
   115 F.3d 143 (2d Cir. 1997) .......................................................................22

*Petrosino v. Bell Atlantic*,
   385 F.3d 210 (2d Cir. 2004) .......................................................................23

*Schwapp v. Town of Avon*,
    118 F.3d 106 (2d Cir. 1997) ...................................................................................22

*Torres v. Pisano*,
    116 F.3d 625 (2d Cir. 1997) ...................................................................................22

*Velasquez v. Goldwater Mem. Hosp*,
    88 F. Supp. 2d 257 (S.D.N.Y. 2007) ....................................................................20

*Whidbee v. Garzarelli Food Specialties, Inc.*,
    223 F.3d 62 (2d Cir. 2000) ....................................................................................22

*Williams v. Consol. Edison Corp.*,
    255 Fed. Appx. 546 (2d Cir. 2007) .......................................................................17

*Zakrzewska v. New Sch.*,
    598 F. Supp. 2d 426 (S.D.N.Y. 2009) ..................................................................17

## STATE CASES

*Okayama v. Kintetsu World Express (U.S.A.) Inc.*,
    No. 111494/2005, 2008 NY Slip Op. 31691U (Sup. Ct. June 12, 2008) ...........18

*Williams v. N.Y. City Hous. Auth.*,
    61 A.D.3d 62 (1st Dep't 2009) ..................................................................... 18, 21

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 59 ...............................................................................................................17

Fed. R. Civ. P. 59(d) ..........................................................................................................17

## FEDERAL STATUTES

42 U.S.C. § 1981 ................................................................................................................. 1

42 U.S.C. §§ 2000e *et seq.* ............................................................................................... 1

## <u>STATE AND LOCAL STATUTES</u>

N.Y. Exec. Law §§ 290 *et seq.*................................................................................................ 1

N.Y.C. Admin. Code §§ 8-101 *et seq.*..................................................................................... 1

N.Y.C. Admin. Code § 8-107(13)(b)(1)-(2) ...........................................................................18

N.Y.C. Admin. Code § 8-107(13)(b)(3) ..................................................................................19

N.Y.C. Admin. Code § 8-107(13)(d) .......................................................................................19

N.Y.C. Admin. Code § 8-107(13)(e).........................................................................................19

Pursuant to the Court's Notice to the Parties under Fed. R. Civ. P. 59(d) (*see* ECF #128), Plaintiff Moises Mendez ("Plaintiff" or "Mr. Mendez") respectfully submits this brief addressing why the jury verdict at the trial of this action on the issue of racial and/or national origin discrimination is against the weight of the evidence.[1]

## PRELIMINARY STATEMENT

For the reasons set forth in his opposition to the post trial motions by Defendant Starwood Hotels & Resorts Worldwide, Inc. ("Defendant" or "Starwood"), Mr. Mendez respectfully submits that the jury verdict on his retaliation claim should be affirmed in all respects.  To the extent that the Court determines to grant any aspect of Defendant's motions, however, Mr. Mendez respectfully requests that the Court also enter an order directing a new trial on the issue of racial and/or national origin discrimination in this case pursuant to Rule 59(d), based on the overwhelming evidence demonstrating Starwood's liability on Mr. Mendez's hostile work environment claims under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. (the "State HRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. (the "City HRL").

## STATEMENT OF FACTS

Throughout the course of his employment at Starwood's Westin Times Square Hotel (the "Hotel"), from approximately 2003 through the present, Mr. Mendez has been subjected to a constant barrage of discrimination, harassment, threats and intimidation by other employees and managers – including his direct supervisors – because he is Hispanic

---

[1]     Relevant portions of the trial transcript (hereinafter "Tr. __") and trial exhibits cited herein are set forth in the accompanying Appendix to this Brief.

and Ecuadorian.  Despite Mr. Mendez's repeated complaints and pleas for the Hotel to stop the discriminatory and harassing conduct committed against him,[2] the Hotel consistently turned a blind eye to his increasingly desperate plight, and, as determined by the jury, unlawfully retaliated against Mr. Mendez to punish him for his protected discrimination complaints.

Despite being subjected to severe and unrelenting discriminatory harassment at Starwood, Mr. Mendez has at all times conducted himself in a professional and "dependable" manner, and has never been disciplined during his employment.  (*See* Tr. 932:18-25 [Rotolo]; 2070:2-4, 2111:16-18 [Ribbens]).  Moreover, Mr. Mendez has never made discriminatory statements or engaged in any form of discriminatory or harassing conduct against anyone at the Hotel during his employment.  (*See* Tr. 933:3-23 [Rotolo]; 455, 531 [Mendez]).

---

[2]     *See*, *e.g.*, PX_203 (letter of complaint from Mr. Mendez to HR Manager Derrick Carlo regarding harassment and threatening conduct by co-workers, dated Feb. 27, 2006); PX_49 (police report filed by Mr. Mendez regarding harassment and death threat by co-worker Melvin Morales, dated Apr. 21, 2006); DX_164, at SM_2172 (joint letter of complaint by Mr. Mendez and eight co-workers regarding discrimination and harassment by co-worker Fernando Tello, dated May 5, 2007); PX_8 (Starwood Nat'l EthicsPoint Hotline report of complaint by Mr. Mendez regarding "misconduct"/ "possible racial discrimination," dated May 18, 2007); PX_75 (Mendez charge of discrimination against Starwood, filed with State Division of Human Rights on May 21, 2007); PX_11 (letter of complaint from Mr. Mendez to Assistant Director of HR Maria Lavides regarding harassment and threatening conduct by supervisor Antonio Rotolo, dated June 28, 2007); PX_76 (Mendez charge of retaliation against Starwood, filed with State Division of Human Rights on Aug. 15, 2007); PX_14 (letter of complaint from Mr. Mendez to Director of HR Nancy Kiska, Union Business Agent, and Division of Human Rights regarding harassment and ridicule of Mr. Mendez by supervisor Rotolo, dated Sept. 8, 2007); PX_13 (Starwood Nat'l EthicsPoint Hotline report of complaint by Mr. Mendez regarding "discrimination or harassment," dated Sept. 11, 2007); PX_17 (complaint by Mr. Mendez regarding race/national origin discrimination, dated Feb. 6, 2008); PX_19 (letter of complaint by Mr. Mendez regarding discriminatory harassment, dated Feb. 16, 2008); PX_22 (letter of complaint by Mr. Mendez regarding being punched in face by co-worker Mark Kleinman in Hotel kitchen, dated June 17, 2008).

## I. HOSTILE WORK ENVIRONMENT CREATED AND CONDONED BY SUPERVISORS AND MANAGERS AT THE HOTEL

During the course of the more-than three-week trial, the jury was presented with overwhelming evidence of a hostile work environment at the Hotel that consisted of severe and pervasive harassment of Mr. Mendez on the basis of his race and national origin, much of which was actively created, encouraged and condoned by Mr. Mendez's direct supervisors in the Hotel kitchen. For example, the jury heard undisputed testimony that Mr. Mendez's co-worker, Charlie Blanco, called Mr. Mendez a "fucking Ecuadorian punk" in the presence of an Ecuadorian co-worker and their supervisor, Chef Joanne, who failed to intervene or take any form of corrective action in response to Mr. Mendez's immediate complaint.[3]

Mr. Mendez also was subjected to discriminatory comments (*e.g.*, "Mexican, Ecuadorian, Panamanian, same garbage, same shit") and name-calling (*e.g.*, "speedy Gonzalez" and "burrito") by his co-workers in the presence of his immediate supervisor, Executive Chef David Ribbens, who "laughed" and failed to take any remedial action on Mr. Mendez's behalf. (*See* Tr. 453:11-12 [Mendez]; 2131:24-2132:10 [Ribbens]; *see also* 454:8-22 [Mendez] ("I was in disbelief that my boss will approve such discrimination being saying in the kitchen and laughing."); 638 [Mendez]).

Mr. Mendez's supervisor Antonio Rotolo also personally subjected him to discriminatory harassment on the basis of his race and national origin, including by stating to Mr. Mendez, in the presence of his co-workers, "Ecuadorians are dumb." (Tr. 513

---

[3]     Tr. 441:2-18 [Mendez] ("I asked Chef Joanne, Why you don't say nothing? And she says, What do you mean? I say, He's calling me a fucking Ecuadorian punk. And she says, And what that means? I said, Chef, I'm not a fucking Ecuadorian punk. And yeah she did nothing."); Tr. 338:1-3 [Blanco] ("Q. And so that is when you decided to degrade Moises Mendez based on his national origin right then and there, right?"/ "A. It just came out.").

[Mendez]).  Although Mr. Mendez immediately complained about this discriminatory comment to Rotolo, and to Rotolo's supervisor, Executive Chef Frank Tujague, no manager at the Hotel ever followed up with him regarding his complaint.  (*See* Tr. 513:25-515:12, 902:5-11 [Mendez]).  Rotolo also degraded Mr. Mendez by calling him "Mommy" and "Moisesa," and by blowing kisses at him "many, many times" in front of his co-workers, who Rotolo never subjected to such humiliating and harassing conduct.  (*See* Tr. 520 [Mendez]).

On one occasion in June 2007, Rotolo made a threatening gesture as if shooting Mr. Mendez with a gun in the Hotel kitchen, another form of harassing conduct that Rotolo never exhibited against non-Hispanic/Ecuadorian employees.  (*See* Tr. 525-26, 903:16-904:8 [Mendez]).  Mr. Mendez reported Rotolo's threatening and harassing gesture to Chef Tujague, who testified at trial that although Mr. Mendez had raised a "very serious allegation," he could not recall a single thing that Mr. Mendez said when he reported the incident, which Tujague, in turn, failed to report to Human Resources, in violation of the Hotel's written policy on discrimination and harassment.  (*See id.*; 1954:1-1955:1 [Craddock]); 2322:18-25 [Tujague]; 1765 [Lavides]).

Mr. Mendez also submitted a written complaint regarding Rotolo's threatening and harassing conduct to Assistant HR Director Maria Lavides.  (Tr. 527:12-15 [Mendez]; PX_11).  Although his written complaint began with the statement, "As you already know, since a long time ago, I've been the victim of all kinds of verbal, nonverbal, and written harassment," Lavides failed to ask Mr. Mendez a single question about this statement, and never followed up with him regarding any aspect of his written complaint, acknowledging at trial that her failure to do so was in violation of her training and obligations as Assistant Director of HR.  (*See* Tr. 1717:21-1721:8 [Lavides]).

Lavides also failed to ask Mr. Mendez whether any witnesses had observed Rotolo's threatening gun gesture, another conceded violation of her training and duties as Assistant Director of HR. (Tr. 1723-24 [Lavides]). Although Lavides claimed that she investigated Mr. Mendez's complaint by speaking with Rotolo and Tujague, she ultimately concluded that Mr. Mendez must have misinterpreted Rotolo's gesture based on her perception of Rotolo's hand gestures while speaking with her, and failed to admonish Tujague for violating Hotel policy by failing to report Mr. Mendez's complaint to HR in the first instance. (Tr. 1722, 1764:10-1766:4 [Lavides]).

### A.    Enforcement of Discriminatory No-Spanish in the Workplace Policies

Mr. Mendez's supervisor Chef Joanne also prohibited Mr. Mendez from speaking Spanish in the kitchen (Tr. 418-19 [Mendez]; 2183:10-14, 2205:7-20 [Burrowes]), as did Executive Chef David Ribbens (Tr. 413-17 [Mendez] ("No fucking Spanish in the kitchen")), despite the fact that numerous other languages were spoken openly in the kitchen "every day" (Tr. 411:1-16, 415:3-7 [Mendez]). Although Mr. Mendez made separate complaints about this discriminatory no-Spanish rule to HR Director Nancy Kiska, Food and Beverage Director John Sheedy, and Hotel General Manager John Sweeney, no supervisor or manager ever followed up with Mr. Mendez regarding his complaints or the enforcement of a no-Spanish rule against him in the kitchen. (*See* Tr. 417, 422-23 [Mendez]).

The evidence at trial also included similar testimony by three employees in the Service Express department, who testified that although their co-workers were permitted on a daily basis to converse freely in numerous languages other than Spanish – including Trinidadian, Filipino (Tagalog), Lithuanian, Jamaican, Polish, Indonesian, Chinese, Indian and Bangladeshi – at least four different managers in their department enforced a no-

Spanish in the workplace policy from 2006 through July 2007. (*See* Tr. 71, 73-75, 78, 82-86, 111, 113 [Ayala]; 116, 121, 125-26 [Ocasio]; 148-51, 158, 161-62 [Bay]; *see also* 1322-25 [Kiska] (denying that Service Express manager told employees they could not speak in Spanish, despite having attested to issuance of such directive in prior affidavit); 1622:1-9 [Kiska] (agreeing that language "absolutely" relates to national origin)). The Service Express Department is adjacent to the main kitchen, and the employees who were subjected to a discriminatory no-Spanish in the workplace policy testified that they discussed the Hotel's enforcement of the policy with Mr. Mendez, including at a hearing on their respective charges of race and national origin discrimination before the State Division of Human Rights. (*See* Tr. 69-70, 92-93 [Ayala]; 164 [Bay]; 131 [Ocasio]).[4]

## II.   HOSTILE WORK ENVIRONMENT AND HARASSMENT BY CO-WORKERS

### A.   Discriminatory Statements

The evidence at trial demonstrates that Mr. Mendez was also subjected to a hostile work environment on the basis of his race and national origin due to the conduct of his co-workers, who called him discriminatory and degrading names on an almost-daily basis, left despicable, racist and offensive notes in his locker, degrading pornography on his workspace that referred to his national origin, and threatened him with physical violence. For example, Mr. Mendez was called:

> Mexican piece of shit, a Mexican burrito, Ecuadorian Chihuahua, Ecuadorian Speedy Gonzalez. . . . I was called [sic] I was Mexican and I would say I'm not Mexican. And this person would say, okay, Mexican, Peruvians, Ecuadorians, Panamanians, the same garbage the same shit.

---

[4]   Kiska conceded at trial that a copy of the Service Express employees' written complaint about the no-Spanish policy is not included among the documents in HR's "investigation file" (Tr. 1330 [Kiska]; DX_169).

(Tr. 452:20-453:8, [Mendez]).  Mr. Mendez was called these offensive, racist names "[m]any, many times" (*id.*), including, as noted above, in the presence of his direct supervisor, Executive Chef Ribbens.  (Tr. 454 [Mendez]; 2131:24-2132:10 [Ribbens]).  Mr. Mendez also was called a "fucking Ecuadorian," as well as Spanish names degrading his national origin, on innumerable occasions and an almost-weekly basis.  (*See* Tr. 890:11-12, 457-58, 552, 567-68 [Mendez]).  Although Mr. Mendez repeatedly complained about this discriminatory harassment to his supervisors – including Chef Joanne and Food and Beverage Director Sheedy – none of his co-workers were ever disciplined or reprimanded, and no manager at the Hotel took any remedial or corrective action on Mr. Mendez's behalf in response to his repeated complaints.  (*See id.*; 1894-96, 1901, 1915-16 [Sheedy]).

Mr. Mendez testified about one particularly severe and degrading series of harassing statements that his co-worker directed against him when he was suffering from intestinal pains and needed to leave work early:

> I hear Charlie Blanco making this comments about the Ecuadorian bitch shedding blood and menstruating through his ass.  When he says this the sous chef Samuel laughed so loud and he has a red juice in his mouth and he spit all the juice over the working table and Charlie Blanco goes that's it, that's it, that's the bitch's blood, the Ecuadorian bitch's blood.  They laughed so loud . . .  I feel degraded . . .  I feel extra pain on my body, on my soul.

(Tr. 445 [Mendez]).  Mr. Mendez testified that he reported this offensive comment to Chef Ribbens, who, as always, failed to take any action in response to Mr. Mendez's complaint.  (Tr. 445-46 [Mendez]).  Blanco also contributed to a racially hostile work environment by spewing racist invective against Mr. Mendez's African-American co-workers, including calling them "monkey, ape, King Kong" (Tr. 447:25 [Mendez]), "monkeys," "those fucking

people" and "prietos" (Tr. 2189:21-2190:15, 2199:4-16 [Burrowes]; *see also* 448:4-5 [Mendez] ("[Y]ou don't have to take chicken wings.  The monkey eats the bananas")).[5]

The jury also heard substantial testimony concerning another of Mr. Mendez's co-workers, Fernando Tello, who made racist and threatening statements to Mr. Mendez (*e.g.*, "Stupid Mexican, Mexican piece of shit, Ecuadorian [*Spanish word*], Ecuadorian [*Spanish word*];" Spanish word meaning "I'm going to fuck your wife" (Tr. 537:16-18, 456:14-16 [Mendez])), and African-American members of the kitchen staff (*e.g.*, "He used to wave bananas.  He used to throw bananas at them.  He used to call them monkeys, apes."  (Tr. 540 [Mendez])).  Tello also frequently spat at Mr. Mendez and African-American co-workers in the culinary department.  (Tr. 539:6-8 [Mendez] ("In the kitchen, when he's mopping and cleaning, he would see me or my black co-workers and he would just spit when we were walking through or next to him.")).  Tello also engaged in these forms discrimination on a "constant" basis.  (Tr. 537-40 [Mendez]).

Mr. Mendez complained about Tello's racist and threatening harassment to Human Resources manager Derek Carlo in writing, and orally, on at least four different occasions.  (*See* Tr. 2251, 2253-54, 2257, 2260 [Carlo]; *see also* 537:18-19 [Mendez] ("when he always insult me, he insult me naming my nationality")).  Mr. Mendez and a group of his co-workers also submitted a joint written complaint to Human Resources regarding Tello's threatening and harassing behavior, "pray[ing] that a right decision will prevail."  (*See* Tr. 541 [Mendez]; DX_164, at SM_2172).

---

[5]     *See also* PX_208 (email from Rotolo to Tujague making disparaging reference to African-American pastry chef as "Courius [sic] George"); Tr. 998:3-13 [Rotolo] ("I didn't see anything wrong with it, no."); 2346:1-7, 2347:5-12 [Tujague]; 996:10-16, 997:1-3, 998:3-13 [Rotolo]; *cf.* Tr. 2345:4-10 [Tujague] ("[Q.  Calling Black co-workers monkeys,] that's a racist thing to do, right?" / "A.  I guess." / "Q.  Did you say you guess?" / "A.  Yes.").

Lourdes Shapiro, Assistant Director of HR, testified that she conducted an investigation of the joint discrimination complaint against Tello, including interviewing his co-workers, who confirmed that Tello called African-American employees "monkeys," spat at his co-workers, and even threatened to kill another employee at the Hotel. (*See* Tr. 1167-72 [Shapiro]). After completing her investigation, Shapiro submitted a written report to HR Director Nancy Kiska, setting forth the results of her investigation, as well as her ultimate "determination that Fernando Tello acted in an inappropriate and unprofessional manner displaying aggressive behavior towards his co-workers," and her recommendation that Tello receive a five-day suspension. (*See* DX_164, at SM_2165; Tr. 1172-73, 1175-76 [Shapiro]). Incredibly, Kiska disregarded Shapiro's recommendation, declined to suspend Tello, and instead issued him a written warning regarding the Hotel's policies on discrimination and violence in the workplace. (*See* Tr. 1283-85 [Kiska]).

In one of the most important moments at the trial, Kiska testified that, despite the reports from numerous employees regarding Tello's misconduct, she does not believe that witnesses' statements constitute "evidence" sufficient to justify termination or severe disciplinary action, and that she would not, as a matter of policy and practice, terminate an employee on the basis of discriminatory or harassing misconduct the she or an HR official under her supervision did not personally observe. (Tr. 1286:9-1287:14 [Kiska]).[6]

---

[6] Tr. 1286:13-1287:14 [Kiska] ("I don't know that there's a number that says if this many of your coworkers come forward and make an allegation that I can go around and just say you're fired because ten came forward or four came forward or nine came forward. . . . If one person says it, it's very serious and I take it seriously. If it's one, ten or a hundred, absolutely. But I still have the burden of proof before I can take someone's job away. . . ." / "THE COURT: Are you saying that it's not proof if somebody says it?" / "THE WITNESS: Yes, that's what I'm saying." / "THE COURT: That's not proof, that's not evidence? You'd have to see it happen or hear it happen for it to be evidence?" / "THE WITNESS: Yes. He asked me the number. I said I don't think there's a magic number.").

## B.  Threats of Violence

Mr. Mendez testified that while he was working in the kitchen in mid-2005, a co-worker, Francisco Rodriguez, without any provocation, "started yelling at me in Spanish, Mexican words insulting me.  And at the end he says he wish to send my body to Ecuador in a coffin." (Tr. 530-31 [Mendez]).  Although Mr. Mendez promptly reported Rodriguez's threat to his supervisor, Executive Chef Ribbens, Rodriguez was never disciplined, and neither Ribbens nor anyone from the Human Resources department ever followed up with Mr. Mendez regarding the incident.  (*Id.*).  When Mr. Mendez's co-worker Melvin Morales also threatened to kill him while working overnight in the kitchen in April 2006, Mr. Mendez immediately reported the threat to security manager Jorge Chico.  (Tr. 531-32 [Mendez]).  Chico called Kiska that same night to report the incident and, after asking to speak to Mr. Mendez, Kiska promised him that she would investigate the incident and take appropriate action against Morales.  (Tr. 533 [Mendez]).  However, neither Kiska nor any HR employee or manager at the Hotel ever followed up with Mr. Mendez regarding Morales' threat.  (*Id.*).  Fearing for his safety, Mr. Mendez filed a police report with the New York City Police Department regarding the incident, and gave copies of the paperwork provided to him by the precinct to multiple Human Resources managers.  (Tr. 535; PX_6/PX_49).  Despite Mr. Mendez's police report, the Hotel never took any action in response to his complaint about Morales' threat against his life.  (*Id.*)  The Hotel likewise failed to follow up with Mr. Mendez or take any remedial action in response to his report to Hotel security about Tello shoving him in the kitchen without provocation.  (Tr. 539 [Mendez]).

## C. Discriminatory Notes and Pornography

The jury heard testimony regarding multiple discriminatory notes that were left for Mr. Mendez in his locker adjacent to the HR department at the Hotel. (Tr. 459:13-15 [Mendez]). For example, Mr. Mendez received a note in June 2007, which stated "Moises Mendez Stop Crying Mexican Piece of Shit or Else Fuck you!" (Tr. 462-65 [Mendez]; PX_9). In January 2005, he also received multiple notes, which referred to him, *inter alia*, as "the best cock sucker" and "the best Mexican that crossed the border." (*See* PX_10; PX_102; PX_103). Although Mr. Mendez provided copies of these offensive and discriminatory notes to Kiska, no one in HR ever interviewed him or otherwise responded to this written evidence of discriminatory harassment being committed against him in the workplace. (*See* Tr. 462-65 [Mendez]).

Mr. Mendez's testimony at trial also revealed that his co-workers left pictures of homosexual pornography with handwritten captions derogating his national origin in the vicinity of his workstation on numerous occasions. (*See* Tr. 501:11-12, 573:2-10 [Mendez]).[7] Although Mr. Mendez complained about this harassment to his supervisor Chef Ribbens (Tr. 502-503 [Mendez]), HR manager Carlo (*id.*; 2246:18-2247:11, 2266:19-2267:5 [Carlo]), and HR Director Kiska (Tr. 572:9-17 [Mendez]), no one was ever disciplined in response to his repeated complaints (Tr. 502-503 [Mendez]).

---

[7] Tr. 573:2-10 [Mendez] ("Q. Can you describe the pornography that you gave to Nancy Kiska and to Derrick Carlo in human resources?" / "A. It is very many, many, but I can give you one example. There was two men having sex. One of the men was a tall, tall very tall man, white man, and the other person was a midget. And this person, the midget, was having oral sex with this big man, and they put my name in there. And the penis says Ecuadorian and then the midget part they put my name, Moises Mendez.")

## III.    FAILURES AND INDIFFERENCE OF HUMAN RESOURCES DEPARTMENT

The evidence at trial demonstrated that HR officials and Hotel managers were either entirely ignorant of the Hotel's written policies regarding discrimination and harassment, or simply did not care enough to properly apply them in the workplace.  For example, Mr. Mendez's former supervisor, Rotolo, testified that during his employment he was totally unaware of any written policies at the Hotel regarding employment discrimination or retaliation.  (Tr. 950:13-19 [Rotolo]).  Rotolo also testified that he never received any training regarding retaliation or violence in the workplace, and that, as far as he knew, no one at the Hotel had ever received such training.  (Tr. 951:20-952:8 [Rotolo]).

HR Director Kiska was initially adamant in her testimony that employees are "absolutely" obligated to report incidents of discrimination or harassment to the Human Resources department.  (Tr. 1367 [Kiska]).  She also falsely testified emphatically about the existence of a "dual reporting" obligation at the Hotel, pursuant to which employees are required to report complaints of discrimination or harassment to their supervisors as well as Hotel security.  (Tr. 1307:1-1308:22 [Kiska]).  However, upon being confronted with the text of the Antidiscrimination Policy enforced by her department, Kiska conceded that the policy does *not* include any obligation for employees to report incidents of discrimination or harassment to security, and provides that only supervisors – not employees – are required to report incidents of discrimination or harassment to HR.  (Tr. 1576:25-1577:24, 1579:1-18, 1595:15-1596:21 [Kiska]; *accord* 2326:14-2328:1 [Tujague]).

Similarly, Kiska testified that she was unable to take disciplinary action against Tello on the basis of his having threatened to kill a co-worker outside the Hotel premises, because when employees engage in conduct warranting termination or disciplinary action

12

outside the Hotel premises, "I can't do anything.  I don't have the jurisdiction outside of my own hotel or obligation or – what's the right word?  I guess I don't have any authority to do anything."  (Tr. 1503:24-1504:8 [Kiska]).  However, contrary to Kiska's testimony, Starwood's Violence in the Workplace Policy (which Kiska directed Mark Kleinman to sign after claiming that Mr. Mendez's allegations about being assaulted by Kleinman could not be corroborated) proscribes, among other things, "threatening, intimidating or coercing fellow Associates or guests on or off Company premises at any time for any purpose."  (*See* Tr. 1490 [Kiska]; DX_177, at SM_509).  Shapiro attested to a further misapplication of this policy in connection with Kiska's response to Mr. Mendez's allegation of being punched in the face by his co-worker Kleinman in the Hotel kitchen, acknowledging that she could not provide any explanation for Kiska's failure to terminate Kleinman for purportedly engaging in "horseplay" with Mendez, which constitutes a violation of the Hotel's "zero tolerance" policy for violence in the workplace.  (*See* Tr. 1187:3-12 [Shapiro]).

Kiska offered similarly inexplicable testimony regarding the status of various discriminatory statements directed against Mr. Mendez and other employees in the Hotel, testifying, for example, that when Mr. Mendez provided her with a copy of a discriminatory note that had been left in his locker stating "Moises Mendez, stop crying, Mexican piece of shit or else, fuck you" (PX_9),  she did *not* believe that the note violated the Hotel's zero tolerance policy for discrimination and harassment in the workplace, and insisted that she would need "a lot more information" to make that determination.  (*See* Tr. 1590:2-1591:3, 1431:5-9 [Kiska]; *see also* 2319:23-25 [Tujague] ("Q.  Do you consider the statement Mexican piece of shit offensive?" / "A.  It depends on the context.").  Moreover, Kiska testified that after Mr. Mendez confirmed that he had no witnesses who could identify the

author of the despicable note, "At that point I don't know what else there was to do. I can't accuse 600 employees of doing that." (Tr. 1231:16-1232:5 [Kiska]). But Kiska ultimately conceded that she could have taken numerous steps to investigate the issue, including distributing questionnaires to Mr. Mendez's co-workers, directing Hotel security to interview employees with lockers in the vicinity of Mr. Mendez's, or asking Executive Chef Tujague to try and obtain further information from the culinary staff. (Tr. 1587:13-1591:3 [Kiska]).

The Hotel's willful indifference to Mr. Mendez's discrimination complaints and the safety of its employees in the workplace was also underscored at trial by its failure to present any defense or rebuttal to the overwhelming evidence that Human Resources officials altered the executed witness statement of Ricky Ferraro, deleting his reference to having observed Kleinman "with fist in the bowl going to smash (MM) a little bit in the face (with fist in the bowl)." (*Compare* PX_54, *with* PX_55; *see* Tr. 1203-16 [Kiska]; 1111-24 [Shapiro]). Despite having been questioned at her deposition about the existence of an altered version of Ferraro's statement more than one year prior to trial, Kiska testified that she never asked anyone in her department, or anyone at the Hotel, a single question about the subject, although she acknowledged that the alteration of Ferraro's statement constituted a violation of the Hotel's written vandalism policy. (Tr. 1215:11-1216:20 [Kiska]; PX_54). Moreover, despite the inexplicable existence of two plainly different versions of a purportedly verbatim transcription of Shapiro's interview with Mr. Mendez regarding his allegations against Kleinman, Kiska denied that it would have been improper for HR to have edited the original by selectively deleting Mr. Mendez's responses to certain questions. (*Compare* PX_53, *with* PX_63; *see* Tr. 1258-63 [Kiska]; *see also* 1264:15-22

[Kiska] ("THE COURT: You don't know why it was done, is that not ordinary practice in your department?" / "A. It's a hard question to say yes or no to.")).

Beyond the blatant misconduct of Kiska or HR employees under her supervision evidenced by alteration of documents associated with the purported investigation into Mr. Mendez's allegation that he was assaulted by Kleinman, Shapiro conceded that she could not recall asking Mr. Mendez any questions regarding the statements in his written complaint that "I do not feel safe in my own working environment" and "I'm tired of being mistreated and misunderstood at work on a constant basis." (Tr. 1100:9-12, 1101:14-21 [Shapiro]). And despite Ferraro's corroboration of Mr. Mendez's allegations that, at the time of the incident, (i) Ferraro was speaking on the phone, (ii) near the kitchen doorway, (iii) when Kleinman approached Mr. Mendez, (iv) with his fist in the bowl, (v) as if to punch Mr. Mendez in the face – Shapiro and Kiska testified that their investigation had failed to corroborate *any* of Mr. Mendez's allegations. (*See* Tr. 1201:9-1202:8 [Kiska]; 1106:1-24 [Shapiro]).

Maria Lavides, the Assistant Director of HR, evidenced a similar indifference to investigating or attempting to remedy Mr. Mendez's discrimination complaints, conceding that she violated her training and obligations by completely ignoring the statement in Mr. Mendez's written complaint that "As you already know, since a long time ago, I've been the victim of all kinds of verbal, nonverbal, and written harassment." (*See* Tr. 1717:21-1721:8 [Lavides]; PX_11). The weight of the evidence at trial demonstrates that these failure were consistent with the HR Department's general indifference to Mr. Mendez's repeated complaints of discrimination and harassment, as exemplified by Lavides' instruction to Shapiro – "The idea is that we will show that we are making an effort to investigate even if

we do not finish it" – in connection with Mr. Mendez's complaints of discriminatory harassment against him by his supervisor Rotolo.  (*See* Tr. 1711:12-1714 [Lavides]).  This conclusion also was reinforced by Carlos Urrutia's testimony about Kiska throwing him out of her office when he and his co-workers attempted to report a dispute in his capacity as a Union delegate, as well as Rojas' testimony about Lavides ordering Urrutia to "shut up" when he accompanied her to raise a complaint with HR on a separate occasion.  (Tr. 191:12-22, 212:12-19 [Urrutia]; 2056:23-2057:11 [Rojas]).  The absence of any genuine intent to ensure that appropriate corrective actions are taken in response to employees' complaints of discrimination is also evidenced by the Hotel's inexplicable failure to inform Mr. Mendez's supervisors of discrimination complaints by employees under their supervision in the culinary department.  (*See* Tr. 2128:25-2129:20 [Ribbens], 981:15-983:3 [Rotolo], 2343:7-2345:3 [Tujague] (never informed or questioned about discrimination complaints against Tello); 2328:11-22 [Tujague] (never informed or questioned about Mr. Mendez's written discrimination complaint PX_9 ("I Moises Mendez feel discriminated for being Ecuadorian/Latino for a long time and in many different forms")); 2328:24-2329:4 [Tujague] (never informed or questioned about Mr. Mendez's written discrimination complaint PX_19 ("The harassment that goes on between Mr. Antonio Rotolo and associates in the main kitchen should not be tolerated.  I feel because I am a Hispanic, who happens to be an Ecuadorian, that their [sic] holding something against me, harassing and discriminating me every chance they get.  I feel that I am still being ridiculed by Antonio Rotolo. . . . I can't bare [sic] all of this and I am pleading for some resolution. . . .").

**ARGUMENT**

The Court may grant a new trial pursuant to Rule 59 even if there is substantial evidence to support the jury's verdict, and may weigh the evidence for itself without viewing it in the light most favorable to the verdict winner. *See Manley v. Ambase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). But a new trial may only be granted if "the court is convinced that the jury has reached a seriously erroneous result, or that the verdict is against the weight of the evidence, making its enforcement a miscarriage of justice." *Id.*

Here, the overwhelming weight of the evidence adduced at trial demonstrates that throughout the course of approximately four years of employment in the kitchen of the Westin Times Square Hotel, Mr. Mendez was regularly called racist, degrading names, and was subjected to insults, ridicule, threats and intimidation by his supervisors and certain of his co-workers on the basis of his Hispanic ancestry and Ecuadorian national origin.[8] Moreover, despite countless complaints and pleas for assistance to his supervisors, Human Resources officials, Starwood's national ethics-point hotline, and even the Hotel's general manager, Mr. Mendez's complaints were never seriously investigated, no disciplinary action (other than "warnings") was ever imposed against any of the wrongdoers, and no one at any level of management ever attempted to take appropriate corrective action to restrain the very severe and pervasive racial harassment against Mr. Mendez and other

---

[8]     Notwithstanding the various statutes of limitations applicable to Mr. Mendez's claims under Section 1981 (four years), the State and City HRL (three years) and Title VII (300 days), the entire period of the hostile work environment endured by Mr. Mendez is properly considered for purposes of determining the Hotel's liability, because incidents of discriminatory harassment contributing to Mr. Mendez's hostile work environment claims occurred within the respective limitations periods. *See Williams v. Consol. Edison Corp.*, 255 Fed. Appx. 546, 549 n.1 (2d Cir. 2007) (quoting *Nat'l R.R. Passenger Corp. (AMTRAK) v. Morga*n, 536 U.S. 101, 117 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment claim may be considered by a court for the purposes of determining liability.")).

employees of color.  Accordingly, the jury verdict on Mr. Mendez's hostile work environment discrimination claims is against the weight of the evidence and seriously erroneous.

## I.  **HOSTILE WORK ENVIRONMENT – CITY HRL**

### A.  **Legal Standards**

Under the City HRL, "a hostile work environment is one in which a person is subjected to any degree of discriminatory intimidation, ridicule and insult as a result of his membership in a protected group." (*See* Jury Charge at 22).  The City law does not impose "an overly restrictive 'severe or pervasive' bar" to liability for a hostile work environment, which a defendant can avoid only by proving "that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Williams v. New York City Housing Auth.*, 61 A.D.3d 62, 79-80 (1st Dep't 2009).

Unlike Title VII, Section 1981 and the State HRL, the City HRL "creates vicarious liability for the acts of managerial and supervisory employees even where the employer has exercised reasonable care to prevent and correct any discriminatory actions and even where the aggrieved employee unreasonably has failed to take advantage of employer-offered corrective opportunities.  Likewise, it provides for employer liability for the discriminatory acts of co-workers in like circumstances provided only that a managerial or supervisory employee knew of and acquiesced in such conduct" or failed to take immediate and appropriate corrective action. *Zakrzewska v. New Sch.*, 598 F. Supp. 2d 426, 435 (S.D.N.Y. 2009); Admin. Code § 8-107(13)(b)(1)-(2); *Okayama v. Kintetsu World Express (U.S.A.) Inc.*, No. 111494/2005, 2008 NY Slip Op. 31691U, at *11-13 (Sup. Ct. June 12, 2008)

(holding that City HRL explicitly precludes availability of federal *Faragher/Ellerth* defense for conduct of managers or supervisors).[9]

### B. Application

Applying these standards, Starwood's liability for subjecting Mr. Mendez to a hostile work environment on the basis of race and/or national origin is inescapable. Indeed, without even considering Mr. Mendez's testimony, the testimony of Starwood's witnesses alone compels this conclusion. As set forth above:

(i)  Blanco admitted to calling Mr. Mendez a "fucking Ecuadorian punk" in the presence of his supervisor, Chef Joanne, who did nothing in response (*see* Tr. 337:4-17, 338:1-3 [Blanco]);

(ii)  Blanco repeatedly referred to African-American kitchen employees as "Monkeys" and "those fucking people" (*see* Tr. 2200:5-18, 2189:21-2190:15, 2199:4-16 [Burrowes]);

(iii)  Chef Joanne told Mr. Mendez and a co-worker not to speak Spanish in the kitchen, but never objected to other foreign languages being spoken in the kitchen (*see* Tr. 2205:7-20, 2183:10-14 [Burrowes]);

---

[9]  If managerial or supervisory employees *should* have known of what was going on (*i.e.*, constructive rather than actual knowledge, *see* Admin. Code § 8-107(13)(b)(3)) and failed to take reasonable preventive measures, liability can be avoided if the defendant proves it had:

(1) Established and complied with policies, programs and procedures for the prevention and detection of unlawful discriminatory practices by employees, . . . including but not limited to:

(i)  A meaningful and responsive procedure for investigating complaints of discriminatory practices by employees . . . and for taking appropriate action against those persons who are found to have engaged in such practices;

(ii) A firm policy against such practices which is effectively communicated to employees . . . ;

(iii) A program to educate employees and agents about unlawful discriminatory practices under local, state, and federal law; and

(iv) Procedures for the supervision of employees and agents . . . specifically directed at the prevention and detection of such practices; and

(2) A record of no, or relatively few, prior incidents of discriminatory conduct by such employee . . .

N.Y.C. Admin. Code § 8-107(13)(d); *see id.* § 8-107(13)(e).

(iv)  At least four different managers in the Service Express department enforced a no-Spanish policy from 2006 through July 2007 (although employees were permitted to converse freely in numerous languages other than Spanish), and Mr. Mendez discussed this policy with multiple Service Express employees (*see* Tr. 69-71, 73-75, 78, 82-86, 92-93,111, 113 [Ayala]; 116, 121, 125-26, 131 [Ocasio]; 148-51, 158, 161-62, 164 [Bay]);[10]

(v)  Mr. Mendez's supervisors, Tujague and Rotolo, referred to his African-American co-worker as "Curious George," and insisted that the Hotel's anti-discrimination policy did not prohibit them from doing so (*see* PX_208; Tr. 2345:4-10, 2346:1-7, 2347:5-12 [Tujague]; 996:10-16, 997:1-3, 998:3-13 [Rotolo]);

(vi)  Mr. Mendez's supervisor Ribbens heard Mr. Mendez's co-workers call him discriminatory names, including "Speedy Gonzalez" and "Burrito," and failed to take any corrective action whatsoever in response (*see* Tr. 2131:24-2132:10 [Ribbens]);

(vii)  HR Manager Carlo was aware that someone was leaving homosexual pornography with discriminatory comments targeting Mr. Mendez's national origin in the vicinity of his workstation in the kitchen, and concededly failed to take corrective action and prevent this behavior from recurring (*see* Tr. 2246:18-2247:11, 2266:19-2267:5 [Carlo]);

(viii)  Mr. Mendez and eight of his co-workers complained in writing about Tello spitting and making racist comments to them, and although Assistant HR Director Shapiro determined that their allegations were accurate, Kiska failed to even suspend, let alone terminate Tello due to her belief that the statements of employee witnesses, no matter how numerous, do not constitute actionable "evidence" (*see* DX_164, at SM_2172; Tr. 1167-73, 1175-76  [Shapiro]; 1283-85, 1286:9-1287:14 [Kiska]);

---

[10]     Workplace language policies that prohibit employees from speaking in a particular foreign language – while allowing employees to speak other foreign languages without similar restrictions – can support an inference of intentional discrimination on the basis of national origin.  *Levitant v. City of N.Y. Human Res. Admin.*, 625 F. Supp. 2d 85, 100 (E.D.N.Y. 2008) ("[I]f plaintiff  were able to present evidence that other employees were permitted to speak in, for example, Chinese or Portuguese, but not Spanish, such evidence could support an inference of intentional discrimination on the basis of national origin") (quoting *Velasquez v. Goldwater Mem. Hosp.*, 88 F. Supp. 2d 257, 263 (S.D.N.Y. 2000)) (additional citations omitted); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) (McMahon, J.) (affirming jury verdict on hostile work environment claim where comments such as "Speak English.  Go back to your own country if you want to speak Spanish" entitled jury to conclude "that the hostility directed at plaintiff was based, not only on the language she spoke, but also on her Cuban national origin").

(ix)  Kiska did *not* believe that the note "Moises Mendez stop crying Mexican piece of shit or else fuck you" violated the Hotel's zero tolerance policy for harassment, and failed to investigate or undertake any remedial response in connection with the note, purportedly because Mr. Mendez was unable to identify witnesses with information about the note at the time he provided it to Kiska (*see* PX_9; Tr. 1231:16-1232:5, 1431:5-9, 1587:13-1591:3, 1590:2-1591:3 [Kiska]);

(x)  Food and Beverage Director Sheedy "investigated" Mr. Mendez's complaint about being harassed and called derogatory names by his co-worker Morales pursuant to the Hotel's "zero tolerance" policy, but ended his investigation and took no further action after Morales denied the allegations (*see* Tr. 1915:19-21 [Sheedy] ("Q. You felt that Mr. Mendez said it happened, Mr. Morales said it didn't, so it was no big deal, right?" / "A. That was – yes.").

The testimony and evidence at trial was undisputed with respect to the foregoing items. In each instance, a supervisory or managerial employee either committed the discriminatory conduct at issue, or had actual knowledge that the discriminatory conduct was being committed by employees under their supervision and failed to take any remedial action on the basis of such knowledge. In light of this evidence, the jury verdict on Mr. Mendez's hostile work environment claim under the City HRL can only be sustained as a matter of law if Starwood could successfully prove that all of the foregoing "consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *See Williams*, 61 A.D.3d at 79-80. Such a conclusion is, at the very least, "against the weight of the evidence," and very seriously erroneous.

## II.   HOSTILE WORK ENVIRONMENT – TITLE VII, SECTION 1981 AND STATE HRL

### A. Legal Standards

In contrast to the City HRL, hostile work environment claims under federal and state law require a showing that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"

*See Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  However, "[t]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (quoting *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997)).  "[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim."  *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000) (citations omitted).  Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of his working environment.  *See Perry*, 115 F.3d at 149.

"Evidence of harassment directed at co-workers can be relevant to an employee's own hostile work environment claim, even if the employee was not present when the comments were made and only learned of them second-hand."  *Brewster*, 447 F. Supp. 2d at 348 (citing *Whidbee*, 223 F.3d at 71; *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)).  "Because the crucial inquiry focuses on the nature of the workplace as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."  *Id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

An employer's vicarious liability for harassment in the form of a hostile work environment by non-supervisory co-workers depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take

appropriate remedial action.  *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004).

Where the harassment is attributed to a supervisor and does not culminate in a "tangible

employment action" against the employee, the employer will be liable for the hostile work

environment unless it successfully establishes an affirmative defense by showing that (a) it

"exercised reasonable care to prevent and correct promptly any . . . harassing behavior,"

and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or

corrective opportunities provided by the employer or to avoid harm otherwise."

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998).[11]

Thus, in contrast to the evidence required to establish Starwood's liability for hostile

work environment discrimination under the City HRL, Mr. Mendez must establish that the

discriminatory conduct complained of was "severe" or "pervasive," and that Starwood

either failed to exercise reasonable care to prevent and correct promptly any harassing

behavior, or that he made reasonable efforts to take advantage of any preventive or

corrective opportunities that Starwood afforded him.  Each of these standards is amply

supported by substantial evidence, and the jury's verdict on Mr. Mendez's hostile work

environment claims under federal and state law is therefore against the weight of the

evidence and seriously erroneous.

### B.  Application

With respect to the severity and/or pervasiveness of the harassment committed

against Mr. Mendez on the basis of his race and/or national origin, the evidence described

---

[11]  *See also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 (2d Cir. 2010) ("[t]here is no requirement that a plaintiff exhaust all possible avenues made available" and "an employer is not, as a matter of law, entitled to the *Faragher/Ellerth* affirmative defense simply because an employer's sexual harassment policy provides that the plaintiff could have complained to other persons as well").

in the statement of facts above demonstrates that Mr. Mendez was regularly and repeatedly called despicable names, ridiculed and threatened on the basis of his race and/or national origin over a period of years, and that the Hotel failed to take any meaningful corrective action in response to his innumerable oral and written complaints. *See generally King v. Interstate Brands Corp.*, No. 02-cv-5470 (JFB/RML), 2009 U.S. Dist. LEXIS 36594, at *56 (E.D.N.Y. Apr. 29, 2009) ("[A] steady barrage of racially discriminatory comments can provide a basis for a jury's reasonable finding that plaintiff was subjected to a hostile work environment."); *La Grande v. DeCrescente Distrib. Co.*, Nos. 08-3010-cv/09-1789-cv, 2010 U.S. App. LEXIS 5925, at *7 (2d Cir. Mar. 23, 2010) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (citations omitted).

With respect to the first prong of the *Faragher/Ellerth* defense, the notion that Starwood in any way "exercised reasonable care to prevent and correct promptly" the severe and chronic harassment suffered by Mr. Mendez is completely ridiculous and ignores the overwhelming weight of the evidence in this case. Nothing in Kiska's testimony suggests that the Human Resources Department under her authority at the Hotel has either the capacity or inclination to "exercise reasonable care" and promptly remedy anything, or that it has ever had occasion to do so. Indeed, there was nothing ambiguous about Kiska's testimony, as the head of HR, that witnesses to acts of discrimination and harassment are irrelevant, because no matter how many witnesses might come forward to corroborate reports of misconduct, such corroboration does not constitute "evidence" and cannot serve as the basis for her to take disciplinary action, even against an employee such as Tello,

whose racist and violent conduct had been thoroughly documented by her own department and presented to the jury. The threshold for any sort of remedial response that Kiska identified at trial – namely, discriminatory or harassing conduct that she personally witnesses – cannot be reconciled with the first prong of *Faragher/Ellerth*.

Furthermore, Kiska's testimony that remedial or corrective action is foreclosed with respect to discriminatory and harassing conduct that transpires outside her presence also reduces the second prong of *Faragher/Ellerth* to an irrelevancy. It simply strains reason to suggest that any employee at the Hotel – let alone Mr. Mendez, who availed himself of all conceivable avenues to remedy the severe, pervasive and unremitting harassment that he experienced in the workplace – could be faulted for unreasonably failing to take advantage of any preventive or corrective opportunities provided by Starwood, given Kiska's clear admission that she will never take meaningful corrective action, irrespective of the number of witnesses marshaled in support of a discrimination complaint, based on conduct that she has not personally witnessed. Accordingly, Mr. Mendez respectfully submits that the weight of the evidence – particularly the testimony of Kiska herself – precludes Starwood from successfully invoking *Faragher/Ellerth* with respect to any aspect of Mr. Mendez's claims in this case.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully submits that the jury verdict at the trial of this action on the issue of racial and/or national origin discrimination is against the weight of the evidence.

Dated: New York, New York
      May 14, 2010

Respectfully submitted,

**THOMPSON WIGDOR & GILLY LLP**

Kenneth P. Thompson
Ariel Y. Graff

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
*kthompson@twglaw.com*
*agraff@twglaw.com*

*COUNSEL FOR PLAINTIFF MOISES MENDEZ*