UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/10
```

——————————————————————————— x

MOISES MENDEZ,

      Plaintiff,

    -against-                          08 Civ. 4967(CM)

STARWOOD HOTELS & RESORTS
WORLDWIDE, INC.,

      Defendant.

——————————————————————— x

DECISION AND ORDER DENYING NEW TRIAL ON RACE AND NATIONAL
ORIGIN DISCRIMINATION CLAIMS; DENYING DEFENDANT'S MOTION FOR
JUDGMENT AS A MATTER OF LAW ON RETALIATION CLAIM; GRANTING
DEFENDANT'S MOTION FOR REMITTITUR; AND DENYING MOTION FOR
ATTORNEY'S FEES WITHOUT PREJUDICE TO RENEW

McMahon, J:

## INTRODUCTION

On March 10, 2010, following a multi-week trial, a jury found Starwood Hotels &

Resorts Worldwide, Inc. ("Starwood" or "Defendant") liable to Moises Mendez

("Plaintiff"), who was employed at the Westin Times Square branch of the hotel

management chain, on a single claim. Mr. Mendez's complaint raised a variety of

claims, including discrimination based on national origin (Ecuadorian) and race (Latino)

and disability (diverticulitis and diabetes). The jury found for defendant on all of those

claims. They found for Mendez on just one claim: that the hotel had impermissibly

retaliated against Mendez for engaging in a protected activity (complaining about the

harassment that underlay his other claims). The purported retaliation consisted of

installing a hidden camera above his work station, where it remained for eight days

1

before co-workers found and disabled it.  Defendant claimed that the camera was installed to help management investigate Mendez's claims about vandalism at his work station and locker, but the jury obviously rejected that defense.  For this single transgression, the jury awarded Mendez $1 million in compensatory damages and $2 million in punitive damages.

On April 7, 2010, Starwood moved, pursuant to Federal Rule of Civil Procedure 50(b), for entry of judgment as a matter of law in its favor, arguing principally that (1) the jury's verdict was based upon "surmise and conjecture," and (2) that installation of the hidden camera in and of itself was legally insufficient to constitute actionable retaliation.  (See Docket No. 117.)  In the alternative, Starwood asked this Court to remit the jury's award of damages or order a new trial on the issue of retaliation, pursuant to Federal Rule of Civil Procedure 59.  (Id.)

Two weeks later, on April 21, 2010, Plaintiff, who had opposed both of Starwood's post-trial motions, moved for an award of attorneys' fees.  (See Docket No. 121.)

Shortly thereafter, on April 26, 2010, the Court notified the parties, pursuant to Federal Rule of Civil Procedure 59(d), that it was *sua sponte* considering directing a new trial on the issue of racial/national origin discrimination—as to which the jury had found in favor of defendant—on the ground that the jury's verdict in favor of Defendant on that claim was against the weight of the evidence.  (See Docket No. 128.)  The parties were ordered to address this issue in supplemental briefs.

After an exhaustive review of the trial record and consideration of the parties' presentations, the court (1) declines to order a new trial on the issue of racial/national

2

origin discrimination; (2) dismisses the motion for judgment as a matter of law on the retaliation claim; (3) grants the motion to remit the damage award on the retaliation claim; and (4) denies the motion for an award of attorneys' fees without prejudice.

## FACTS

The following statement of facts is drawn from the trial record.

Moises Mendez began working at the Westin as a "food runner" beginning in June 2003. (Tr. 394:21; 408:12-14.) A "food runner" is what it sounds like – an individual who carts food to different areas or banquet halls of the hotel. (Tr. 399:7-11 (Mendez).)

For two weeks after he finished the hotel's orientation program for food runners, Mendez worked a morning shift, from 5:30 a.m. to 1:30 p.m. (Tr. 409:9-14.) By the end of the second week, Mr. Mendez explained that his "body was not taking that schedule" (Tr. 409:16). Intending to quit, he gave notice to the then-executive chef, David Ribbens (Tr. 408:15-17 (identifying Ribbens as the executive chef); 410:4-5 (providing notice to Ribbens)). Five days after he gave notice, Chef Ribbens asked Mendez why he was leaving; when Mendez identified his schedule as the precipitating cause, Chef Ribbens gave plaintiff a different work slot. (Tr. 410:9-20.)

Mendez continued to work as a food runner at the Westin for approximately eight months, until he accepted a position as a baker at the hotel in early 2004. (Tr. 408:12-14.) Mr. Mendez continued to work as a baker at the hotel through the date of the trial. (Pl.'s Br. at 1.) As far as the court is aware, he remains employed at the Westin to this day.

3

Between 2004 and 2008, Mendez claims to have been subjected to harassment and a hostile work environment on the grounds of his race and national origin. His retaliation claim at trial related solely to an incident that took place in the spring of 2008, after he filed several complaints with the New York State Division of Human Rights. Mendez also claimed to have been subjected to harassment and a hostile work environment on the ground of disability, and much of the most graphic and disturbing testimony at trial focused on the teasing plaintiff suffered about some sort of fistula or scar on his gut, which resulted from surgery for plaintiff's diverticulitis. This wound was referred to by one or more ribald and insensitive co-workers or supervisors as plaintiff's "mangina." However, the jury rejected plaintiff's disability discrimination claim and the court did not *sua sponte* raise the issue of ordering a new trial on that issue. Therefore, this opinion will not catalogue the extensive testimony that relates to plaintiff's disability discrimination claims (including hostile work environment based on disability) – I simply note that this testimony was extensive and disturbing.

## I.    HOSTILE WORK ENVIRONMENT

The following timeline is helpful in assessing plaintiff's claim of hostile work environment on the ground of race (Latino) or national origin (Ecuadorian):

### Timeline of Hostile Work Environment Claim

| | |
|---|---|
| June 2003 | Mendez hired as a food runner at the Westin (Tr. 394:21; 408:12-14.) |
| Dec. 2003 | Mendez told "No Spanish in the kitchen" (Tr. 413:2-3; Tr. |

414:14-17; 631:16-632:5.)

| | |
|---|---|
| Early 2004 | Mendez is promoted to baker (Tr. 427:15.)<br>Verbal harassment by Blanco (Tr. 436:8-437:24.) |
| Late 2004 or mid-2005 | Threat by Rodriguez (Tr. 531:2-5.) |
| Jan. 2005 | Mendez finds three notes in his locker (PX10, PX 102 & PX 103.) |
| April 2006 | Threat by Morales (Tr. 531:17-18.) |
| 2006-2007 | Other employees told not to speak Spanish in the Service Express Department (Tr. 423:25-424:5.) |
| June 2007 | Mendez finds one note in his locker (PX 9.)<br>Rotolo makes a threatening gesture (Tr. 525:16-17.) |
| October 2007 | Rotolo: "Ecuadorians are dumbs [sic]" (Tr. 513:8-11; 770:15-18.) |
| December 2007 | Writing on oven: "Sir Moises Miss Baker" (Tr. 651:14; 733:3-7.) |
| June 2008 | Kleinman punches Mendez with salad bowl (Tr. 559:7-13; 560:6-16.) |
| Between 2005 and 2007 | Pornography left at Mendez's work station and locker on multiple occasions<br>(Tr. 501:6-12; 573:3; 725:11-15.) |
| Unidentified | Verbal harassment by Blanco, Craddock, Monetta, Morales, Tello, and Seguro (Tr. 453:1-19; 454:11-13; 455:7-456:14.) |
| Unidentified | Tello pushes Mendez  (Tr. 538-539.) |

What follows is a summary of the testimony about the above-recited incidents.  I have grouped them by the type of harassment or hostility that they purport to evidence.

*A. Prohibitions on Speaking Spanish*

5

### "No Spanish in the Kitchen" (2003)

While he was a food runner, Mendez said that he heard "different languages" being spoken "openly," "every day" in the kitchen, including "Chinese, Filipino, [and] African." (Tr. 411:1-16.)  Mendez himself spoke Spanish in the kitchen with a number of people in the early days of his employment, when he was a food runner.  (Tr. 411:14-412:3.)  Mendez testified that Chef Ribbens and Executive Sous Chef Joanne (he did not recall her last name (Tr. 408:22-23)) were present when other languages were spoken in the kitchen.

Mendez testified that, in December 2003, Chef Ribbens ordered Mendez and another food runner, Melvin Morales, to stop speaking Spanish in the kitchen.  (Tr. 413:2-3.)  Specifically, Mendez stated that Chef Ribbens "yelled, No fucking Spanish in the kitchen, with fingers pointed at me." (Tr. 414:14-17; 631:16-632:5.)  Ribbens testified that the incident never occurred (Tr. 2135:16-20), and insisted that he had never instructed Mendez not to speak Spanish in the kitchen (Tr. 2135:21-23).

One week after the incident with Chef Ribbens, he was speaking Spanish in the kitchen again, although he was not sure with whom (it might have been Pastry Chef Carla Burrowes).  (Tr. 418:15-17.)  Mendez stated that when Chef Joanne overheard the exchange, she "reminded me [Mendez] that Mr. Ribbens, my boss, Executive Sous Chef Ribbens told me that I'm not supposed to speak Spanish in the kitchen.  She reminded me that I was on the union work probation, that was six months because the hotel was new, and if I kept speaking Spanish in the kitchen, the union would do nothing for me because I was still on job probation." (Tr. 418:24-419:5.)

6

Burrowes testified and denies that anyone had ever told her not to speak Spanish in the kitchen. (Tr. 2178:2-4.) Regarding the incident with Chef Joanne, Burrowes explained that she understood the chef to be asking that the employees not speak Spanish in front of her, because she didn't understand what they were saying – not that the speaking of Spanish was prohibited. (Tr. 2183:12-14.)

Mendez testified that he and Morales went to human resources ("HR") shortly after the incident with Chef Ribbens  (Tr. 415:1-2), where they spoke with director Nancy Kiska and Assistant Director Maria Lavides.  (Tr. 416:6-20.)  According to Mendez, they spoke to HR for "about two minutes, maybe less" (Tr. 417:4-5), and Ms. Kiska promised to "follow-up" on their complaint at the close of their conversation (Tr. 418:7-8); when asked whether Kiska ever got back to him, Mendez responded: "Not up to today." (Tr. 418:12.)

After the conversation with Chef Joanne, Mendez approached the Food and Beverage Director of the Westin, John Sheedy.  (Tr. 419:25-420:1-4.)  Mendez recalls that he was accompanied by several union delegates, including David Motes and Percival Small, when he went to speak with Mr. Sheedy.  (Tr. 420:23-2.)  Mendez testified that he told Sheedy about his meeting with Kiska (the one Kiska denies having) regarding Chef Ribbens' proscription on speaking Spanish in the kitchen.  (Tr. 421:7-14.)  Mendez observed Mr. Sheedy taking notes as he [Mendez] spoke.  According to Mendez, Sheedy "advised me [Mendez] to go back to HR to complain[ ] to Ms. Kiska again." (Tr. 421:17-21.)  However, Mendez did not return to Kiska's office after the meeting with Sheedy, because he was "with [union] delegates and they advised me that Ms. Kiska wouldn't do anything." (Tr. 421:24-25.)  Instead, he and the delegates took the elevator to the eighth

7

floor to complain to the hotel's general manager, John Sweeney. (Tr. 422:3-15.) Mendez
and the delegates told Sweeney "that we went to Ms. Kiska the first time and now we just
came from the office of Mr. John Sheedy, the food and beverage director, and then we
went to see him." (Tr. 422:25-423:3.) Mendez testified that Sweeney "talked to us.
That's a long time, but he advised me and my delegates to go back to HR, and he will
make sure Ms. Kiska is taking care of this." (Tr. 423:6-8.) Mendez did not say whether
he followed Sweeney's advice to go back to Kiska.

Both Sheedy and Kiska testified at trial. Sheedy claimed that he never spoke with
Mendez about the incident. (Tr. 1882:23-1883:9; 1898:16-1899:2.) Kiska denied that
she ever met with Mendez, as he claimed; she testified that she first became aware of
Mendez's allegation about not speaking Spanish during trial preparation. (Tr. 1539:1-9.)
Kiska also testified that she never spoke with Sheedy regarding Mr. Mendez's complaint.
(Tr. 1539:13-17.)

According to Mendez, neither Sheedy nor Sweeney contacted him after he met
with them. However, Mendez believed that Sheedy spoke to Chef Ribbens about the
issue, because Ribbens "went next to where I [Mendez] was working. He says: Moises,
you went to complain to my boss. You complained to my boss. OK, Moises. OK." (Tr.
423:21-23.) Chef Ribbens testified that he had no knowledge of any conversation
between Mendez and Sheedy, although he did not specifically deny Mendez's testimony
about an exchange between the two of them. (Tr. 2136:8-12.)

Whatever happened, Mendez acknowledged that after these two incidents, neither
Chef Ribbens nor Chef Joanne nor anyone else ever told him not to speak Spanish in the
workplace. (Tr. 636:18-637:20.)

8

### Ban on Spanish in the Service Express Department (2006, 2007)

In 2006 and 2007, two to three years after the incidents described above, there was another incident involving a purported instruction not to speak Spanish. (Tr. 74:14-25 (2006); Tr. 78:19-79:24 (2007).)  This instruction was not addressed to Mendez, but (according to Mendez) to two other Hispanic employees, Giovanni Toro and Luze Ayala. Toro and Ayala worked in the Service Express Department—which is referred to colloquially as the "command center"—as telephone operators.  Mendez testified that both Toro and Ayala told him they were prohibited from speaking Spanish. (Tr. 424:11-22.)

Ayala testified at trial.  She recounted that four of her managers—Michael Scott, Mary Schlesinger, Kathleen Schafer, and Oswaldo Mera—told her that she could not speak Spanish "in the [Service Express] department." (Tr. 72:18-24.)  The first manger to tell her to stop speaking Spanish in the command center was Michael Scott, who told her sometime during 2006, after he overheard a non-work-related conversation between Ayala and Olga Thomas, another employee. (Tr. 74.)  No adverse action was taken against Ayala for speaking Spanish in the workplace. (Tr. 98:23-99:4.)

Ayala also heard Scott say that Spanish should not be spoken in the command center on a second occasion in 2006.  This time, the offender was Jessica Ocasio, who was speaking to her mother in Spanish over the telephone. (Tr. 76:4-77:11 (discussing the call); Tr. 75:17-19 (identifying that it took place in 2006).)  Ayala explained that the command center was not supposed to be used for personal calls. (Tr. 99:11-13.)  She did not know whether Ms. Ocasio was disciplined for making personal calls, or for speaking Spanish while doing so. (Tr. 98:17-19).  Ocasio, who also testified, confirmed that Scott

9

told her not to speak Spanish while she was making a personal phone call to her mother. (Tr. 121:22-122:8.)

Ayala was also told to refrain from speaking Spanish at a meeting on July 30, 2007. (Tr. 78:19-79:24.) The purpose of the meeting was to provide Mary Schlesinger, the new director of the command center, with an opportunity to communicate "the changes that she wanted to do in the department and just general things she wanted to change." (Tr. 78:19-24.) "Towards the end of the meeting," Ms. Ayala recalled that Ms. Schlesinger "said that we couldn't speak Spanish in the command center." (Tr. 79:20-24 (Ayala); accord 119:17-19 (Ocasio).)

Two days after the meeting, Ayala and Toro told Schlesinger "that we felt uncomfortable in regards to the meeting, what she had said towards the end of the meeting [about not speaking Spanish], and she denied it. Then, after she denied it, we kept conversating [sic] back and forth that, you know, we weren't comfortable that it wasn't fair, that why could we only speak to guests. It is our native language. And then she said that it was just a misunderstanding." (Tr. 85:19-25.) According to Ayala, Schlesinger stated that "she would never discipline anyone for speaking Spanish." (Tr. 102:13-15.)

Later in the week, having heard nothing further from Schlesinger, Ayala and several other employees "wrote a letter to Starwood corporate." (Tr. 86:12-13; 103:11-15.) The letter was drafted by Giovanni Toro and signed by Toro, Ayala, Jessica Ocasio, Evelyn Berry-Whitby, Tiana Halpin, and Janett [sic] Rubio. (Tr. 86:22-23, 129:11.) The letter addressed "how we could not speak Spanish," which caused her and the other

signatories to feel "discriminated [against] because no other languages were mentioned." (Tr. 86:18.)

Ocasio testified that the letter was given to Nancy Kiska. (Tr. 129:17-18.) Kiska recalled receiving the letter. (Tr. 1317:23-25.) However, she testified that she did not receive the letter directly from the employees, but instead saw it when she received copies of complaints filed by the employees with the New York State Division of Human Rights, to which the letter was attached. (Tr. 1510:13-21.)

Kiska testified that she "met with everyone in the department [command center]" (Tr. 1321:5-6; see also Tr. 1320:24; 1326:17; 1510:23-1511:1; 1622:10-15) to tell them that the hotel had "no language policy," and that, "[a]ll of our associates can speak their native language." (Tr. 1382:17-19.) She also testified that this complaint was the first time she had heard from hotel employees that their managers were prohibiting them from speaking Spanish. (Tr. 1516:3-6.) Kiska's assistant, Maria Lavides, confirmed that this meeting took place. (Tr. 1732:13.)

Hazel Hazzard is a Vice President of the Hotel, Restaurant, and Club Employees Union Local 6, with responsibility for covered employees at the Westin. (Tr. 1654:16-1655:2.) Hazzard learned at some point (she could not recall when) that "in the context of management in a meeting telling employees that they cannot speak English [Spanish], something like that effect." (Tr. 1657:2-4.) She spoke with Nancy Kiska regarding the complaint, and what followed was "a union meeting with Nancy, human resources present, and the members and we took each member's statement." (Tr. 1657:21-22.) At that meeting, Hazzard recalled "Nancy saying that it's against Starwood policy for any one of her managers to imply that employee can't speak in their own language." (Tr.

11

1658:2-4.) Hazzard also testified that, aside from this incident, she had received no other employee complaints regarding the speaking of Spanish or any other language. (Tr. 1658:19-25.)

Ocasio testified that "several days after we gave the complaint to HR," a manager named Mary "said we could [speak Spanish]." (Tr. 136:13-18.)

The record, fairly read, reveals that Mendez was told not to speak Spanish on one or two occasions very early in his employment (well beyond the statute of limitations applicable to this lawsuit), and one of these two incidents was understood differently by Mendez's co-worker (who was present) than it was by Mendez. It also reveals that at a later time, when Spanish-speaking employees other than Mendez were told not to speak Spanish, they complained to management and the directive was immediately revoked.

   *B. Name-Calling*

Mendez testified that he was subject to verbal harassment over the course of his employment once he became baker in April 2004. (Tr. 427:15 (identifying Mendez's start date as a baker).)

**Charlie Blanco (2004)**

Much of the harassment came from another cook named Charlie Blanco, who was the union delegate for the kitchen workers. In the first months of 2004, Blanco, a cook at the Westin, called him a "fucking Ecuadorian punk" while the two men were in Chef Joanne's office. (Tr. 436:8-437:24; 440:1-9.) Mendez testified that he walked into the office and "Charlie Blanco slammed the door closed with very – with I mean very powerful slam. I mean – and four of us [Mendez, Chef Joanne, Charlie Blanco and Abel Toroshima], we stay inside chef's office and Charlie very upset because somebody told

12

him that I say something about him not being a good delegate or something, a fair delegate, and the next thing I recall is that he says that I was a fucking Ecuadorian punk in a very loud and disrespectful way." (Tr. 440:3-9.) In response, Mr. Mendez testified that he asked Chef Joanne, "Why you don't say nothing?  And she says, What do you mean?  I say, He's calling me a fucking Ecuadorian punk.  And she says, And what that means?  I said, Chef, I'm not a fucking Ecuadorian punk.  And yeah, she did nothing." (Tr. 441:14-18.)

Mendez initially testified that he "believe[d] that we went to Ms. Kiska or that time, yes, but I'm not a hundred percent sure that I did." (Tr. 442:23-24.)  On redirect, he admitted that he did not report the incident to HR, because "I thought I don't need to go downstairs because my boss, executive sous chef was present when Charlie Blanco told me that I was a fucking Ecuadorian punk.  And I protested to my boss.  I mean that was her to report it to Ms. Kiska." (Tr. 893:17-20.)

Mendez testified that that was not the only time Blanco made derogatory comments about him in the context of his national origin. When Mendez had a flare-up of his diverticulitis, he asked Blanco, as the union delegate, to help him convince the Chef that Mendez should go home (Tr. 443:5-19), only to "hear Charlie Blanco making this comments about the Ecuadorian bitch shedding blood and menstruating through his ass. When he says this the sous chef Samuel laughed so loud and he has a red juice in his mouth and he spit all the juice over the working table and Charlie Blanco goes that's it, that's it, that's the bitch's blood, the Ecuadorian bitch's blood." (Tr. 445:3-9.)

Mendez was not the only kitchen employee who was the butt of Blanco's bigoted statements; according to plaintiff, Blanco referred to a black kitchen worker named

13

Samuel, whose last name may be Omar (Mendez was not sure), as "monkey, ape, King Kong." (Tr. 447:25.) Mendez recalled that "one specific day I remember that Charlie was frying, deep frying chicken wings and also plantains for the cafeteria. I believe – I'm sure that Samuel, as we call him Sam, he went and take one chicken wing and he says you don't have to take chicken wings. The monkey eats the bananas." (Tr. 448:1-5.) Sam told Mendez that he was going to report the incident to HR. (Tr. 449:1-2.) The record does not reveal when it took place.

### Other Employees

Mendez testified that he was called derogatory, anti-Latino names by people other than Blanco (Tr. 452:17-19), including: "Mexican piece of shit, a Mexican burrito, Ecuadorian chihuahua, Ecuadorian Speedy Gonzalez, in many, many different ways." (Tr. 452:22-24). Two other kitchen workers, Kyle Craddock (who is African American) and Anthony Monetta (Caucasian) would say things like "Mexican, Peruvians, Ecuadorians, Panamanians, the same garbage, the same shit." (Tr. 453:1-19.) Mendez testified that Chef Ribbens witnessed Craddock and Monetta calling him "burrito" and "Speedy Gonzalez," and responded by laughing. (Tr. 454:11-13.) Mr. Mendez did not say how many times this happened or provide a date when any such name-calling occurred.

Craddock, who testified, denied having referred to Mendez as "Speedy Gonzalez," "Ecuadorian chihuahua," "Ecuadorian burrito," "Ecuadorian quesadilla," or saying anything "derogatory towards Hispanics in the workplace." (Tr. 1921:16-25; 1942:10-1943:5.) Craddock also denied ever having said, "Peruvians, Panamanians, and Ecuadorians, all the same shit" or "anything like it." (Tr. 1922:2-6.) But Ribbens—who

14

initially denied overhearing other employees refer to Mr. Mendez as "Ecuadorian burrito," "Ecuadorian Chihuahua," "Speedy Gonzalez," or a "Mexican piece of shit" (Tr. 2083:1-13)—admitted on cross-examination that he was present when Minetta, Craddock and others called Mendez "Speedy Gonzalez" and "burrito." (Tr. 2132:3-10.)

Mendez, who testified that he never said anything derogatory about any of his coworkers (Tr. 5455:3-4), was also called derogatory Spanish names on several occasions by Melvin Morales, a Puerto Rican coworker. (Tr. 456:24-25 (testimony regarding names); 457:8 (Morales' ethnicity).) These included asaroso (male prostitute), punal (gay) and maricon (faggot). (Tr. 455:7-25 (listing the names); 456:24-25 (identifying Morales).) One of Mendez's coworkers, Theodore (Teddy) Emmanus, put this testimony in context by testifying that Mendez and Morales were friends, who were "always laughing and you know, together." (Tr. 1836:25-1837:1.) A Dominican coworker, Pedro Segura, testified that he once heard Mendez call Morales a "fucking Puerto Rican."

Emmanus also said that Mendez made an anti-Hispanic remark (I will have you deported) to Fernando Tello, a Mexican coworker. (Tr. 2218:5-13.) Mendez testified that Tello, a steward at the hotel, told Mendez "boyra [sic] chengar [sic]," (which Mendez translated as "I'm going to fuck your wife," (Tr. 455:7-456:14)). Mendez also testified that Mr. Morales, Mr. Tello and Pedro Seguro referred to him as "chingao," which he translated as one who has anal sex. (Tr. 455:21-23 (listing the name); 457:9-19 (identifying the individuals).) Mendez never heard these phrases used to describe any other Hispanic members of the kitchen staff (Tr. 674:2-5), including Pedro Palacio, Abel Toroshima or Charlie Blanco (Tr. 679:2-11). However, Mendez acknowledged that use of the Spanish word for "faggot" was commonplace in the kitchen; he agreed that it was

15

"just a word that people use when they get angry at someone." (Tr. 676:9-19.) He also

testified that he had heard Mr. Morales, Mr. Tello and Mr. Seguro use other Spanish

words with sexual connotations—punal and maricon (gay) and asaroso (male

prostitute)—about others, including coworkers who were not Hispanic. (Tr. 678:13-18.)

Again, neither the number of times this occurred nor the dates on which it occurred were

provided.

When asked whether he complained to anyone at the hotel about having been

called these names, Mr. Mendez stated that "Well, Kyle Craddock and Anthony Monetta,

my boss, executive Chef Ribbens, was present, so – and Chef Joanne so I always

complained to her that they were discriminating me based on my race or my nationality

or my color." (Tr. 458:14-17.) Mendez also testified that he spoke to Nancy Kiska or

someone else in HR about the situation. Specifically, he stated that "I have the thing in

my head, I did talk to her, HR, someone in HR about this." (Tr. 672:3-8.) Mendez did

not recall the specific name of anyone with whom he spoke, nor was he able to identify a

date (approximate or otherwise) on which he might have made such a complaint. (Tr.

672:9-15.)

Aside from epithets with sexual connotations, Mr. Mendez testified that he

overheard Chef Rotolo say, "Ecuadorians are dumbs [sic]." (Tr. 513:8-11; 770:15-18

(acknowledging that Rotolo was having a conversation with Pedro Palacio at the time the

comment was made).) The comment was made in the context of a discussion about a

soccer match. Mendez reported the insult to Chef Tujaque, one of his supervisors, later

that day (Tr. 514:14-21.) He gave varying testimony about whether he did or did not take

16

his complaint to HR. (Compare Tr. 774:5-10 (did not report) with Tr. 909:21-13 (told Kiska and Hazzard about this insult).)

Hazzard denied ever hearing about this incident from Mendez (Tr. 1686:25-1687:2.), as did Chef Tujaque (Tr. 2333:8-11). Chef Rotolo denied that he ever said, "Ecuadorians are dumb." (Tr. 959:18-21.)

Finally, on unspecified dates between 2005 and 2007, someone left pornography on Mendez's locker and at his workstation. Although Mendez did not specify how many times this occurred, he claimed to have received "many" pieces of pornography in this manner. (Tr. 501:6-12; Tr. 573:3 (describing the volume of incidents); Tr. 725:11-15.) One of those incidents—the only one about which he specifically testified—had national origin connotations.

Mendez received a photograph that he described as follows: "There was two men having sex. One of the men was a tall, tall very tall man, white man, and the other person was a midget. And this person, the midget, was having oral sex with this big man, and they put my name in there. And the penis says Ecuadorian and the midget part they put my name, Moises Mendez." (Tr. 573:4-10.) Mendez testified that he saw one of his coworkers, Melvin Morales, leave the pornography on his work station. (Tr. 503:5-7.) Mendez complained to Chef Ribbens and Nancy Kiska (Tr. 502:24-25), as well as to a man whose surname was either "DiCarlo" or "Carlo," and who was identified as "the HR manager" or "human resources director or something." (Tr. 501:24-502:12.) Mendez's attorney later identified the man in question as Derrick Carlo. (Tr. 572:16-17.) Mendez testified that he gave copies of the pornographic material to both Carlo and Kiska. (Tr. 572:13-15; 573:1-10.) However, Kiska and Chef Ribbens both testified that they did not

17

receive copies of the pornography. (Tr. 1346:20-22 (Kiska); Tr. 2127:18-20 (Ribbens).) Carlo recalled receiving one pornographic picture from Mendez (Tr. 2246:18-23), and testified that Mendez suspected that Morales and Tello put that picture on his workstation. (Tr. 2246:18-25; Tr. 2267:8.)

In sum, the record reveals that over the course of four years in the kitchen, plaintiff was insulted on more than one, but an unspecified number of occasions, by co-workers. If Mendez is believed, four or five specific incidents involved him being called names that reflected poorly on his Latin or Ecuadorian heritage, including one involving pornography. Other incidents were more scatological in nature, with no indication of either national origin or racial discrimination. Other kitchen workers, including non-Hispanics and non-Ecuardorians, were similarly referred to in scatological terms while working.

### C. Other Incidents of Harrassment

**Notes in Mendez's Locker**

Mr. Mendez testified that from time to time he found harassing and unsigned notes in "[t]he locker that I have on the lower level, sir, next to HR's office." (Tr. 459:14-15.) One such note (marked PX 9), which he received on either June 15 or 16, 2007 (Tr. 462:13-24), read: "Moses Mendez Stop Crying Mexican Piece of Shit, or Else Fuck You!" (PX 9.) Ana Liza Bay testified that she saw one note that was left for Mr. Mendez in 2007. (Tr. 166:16-20.) Carlos Urrutia testified that Mendez told him that "somebody left him [Mendez] a very bad note" a couple days after the lock on his locker was damaged. (Tr. 187:22; 187:25-188:1.)

Mendez testified that he gave this note to Kiska. He explained to Kiska and Lavides that he did not know who had left it for him. (Tr. 724:14-21.) However, Mendez also testified that Melvin Morales told him that Morales had put the notes in his locker (Tr. 726:13-727:8), although he did not recall when Morales told him that. (Tr. 726:13-727:8.) Mendez told Ms. Kiska about Morales' confession. (Tr. 728:6-7.)

Mendez identified three other notes that he received during a short period in January 2005 – two and a half years before he received PX 9. (Tr. 463:3-22.) All three notes were signed "Your buddy." PX 102, dated January 5, 2005, read: "Por ser el mejor repostero lambon," which Mendez translated as "for being the best baker kiss ass." (Tr. 643:25; PX 102.) PX 10, dated January 10, 2005, read "For the best cock sucker." (PX 10.) PX 103, dated January 10 (no year, but from "Your buddy," and so likely sent in 2005) read: "For being the best mexican that crossed the border." (PX 103.) Mendez was "sure" that he gave copies of these notes to Kiska and Lavides in 2005. (Tr. 725:25-726:4-8.) Mr. Mendez also testified that he gave a copy of PX 9 to Ms. Kiska and Ms. Lavides.

Chef Ribbens testified that he did not remember Mendez ever complaining to him about threatening notes being left on his locker. (Tr. 2081:13-15; Tr. 2108:6-8.) Kiska testified that Mendez showed her PX 9 on or around June of 2007 (Tr. 1423:25-1424), but claimed that she never saw the three earlier notes. (Tr. 1424:6-8.)

Hazel Hazzard, the Union leader, testified that Mendez sent her a copy of the note marked PX 9 (the 2007 note) with the additional text: "Hazel, I have three more notes like this." (Tr. 1687:5-17; see also DX 24). Hazzard never saw the other three notes to which Mendez referred. (Tr. 1687:18-19.)

19

The record, fairly read, reveals essentially two instances of harassing notes, and a total of four such notes – three left within a very short period in January 2005, then nothing for two and one half years, and one note left in June 2007.

*D. Threats in the Workplace (2004/2005, 2007)*

Mendez testified that his physical safety at the Westin was threatened on three occasions – once in either 2004 or 2005, once in 2006 and once in 2007.

### Francisco Rodriguez (2004 or 2005)

At first, Mendez testified that coworker Francisco Rodriguez made a threat against him sometime in "mid 2005." (Tr. 530:17-19.) However, during cross examination, Mendez acknowledged that it could have occurred "at the end of 2004." (Tr. 698:13-15.) Mendez recalled that Francisco Rodriguez "was making soup close to my station, and he is a very violent person. And he started yelling at me in Spanish, Mexican words insulting me. And at the end he says he wish to send my body to Ecuador in a coffin." (Tr. 531:2-5.) Mendez testified that he "told [Rodriguez] not to say that. I told him that it's inappropriate, told him things in Spanish that, not to talk to me like that again." (Tr. 531:8-10.)

Mendez complained to Chef Ribbens. (Tr. 531:12-14.) Chef Ribbens denied that Mendez ever reported the Rodriguez incident to him. (Tr. 2081:4-6.)

### Melvin Morales (2006)

Mendez testified that Melvin Morales made a threat against him in or around April 2006. (Tr. 531:17-18.) Mendez was at his station, working overnight. (Tr. 531:21-22.) He stated that Morales "was very upset and yelling, saying words in Spanish, and he went to my station and he told me, Look, Moises . . . (The witness speaks in Spanish)

20

And he was very mean.  I mean, his expression was that, yes, he was going to kill me,

yes." (Tr. 532:3-9.) After the exchange, Mendez complained that same night to security.

(Tr. 532:17-21.) He testified, "I believe I called the security manager who was Jorge

Chico, and security came upstairs. I don't recall if it was two or three security persons.

And Jorge Chico took me downstairs because I was very scared, and he took me

downstairs to his office. That night he contacted Ms. Kiska on the phone." (Tr. 532:21-

15.) Mendez confirmed that he spoke to Kiska that night, and "She told me, she

promised me that she was going to investigate." (Tr. 533:12-13.) However, according to

plaintiff, Kiska did not follow up with him after that conversation.  (Tr. 533:22-24.)

Around the "end of April," Mendez filed a police report about this incident.  (Tr.

535:409.) He then gave a copy of the report to "Mr. DiCarlo, Jeff [Chef] Ribbens and

Ms. Kiska." (Tr. 536:9 (mistakes in original).)

### Chef Rotolo (2007)

Finally, Mendez testified that, "at the end of June 2007," Chef Rotolo made a

"gun gesture" (i.e., made a "gun" with his thumb and forefinger and pointed the

forefinger at plaintiff) during a conversation at Mendez's work station.  (Tr. 525:16-17.)

According to Mendez, Chef Rotolo asked him "to do something in the other kitchen that

it wasn't on my job description." (Tr. 525:23-24.)  In response, Mendez stated that he

"asked him if he's going to pay me the differential," as required by union rules when an

employee does work that it not in his category. (Tr. 526:1-5.)  Rotolo "says, the

differential, well, that's the way you want it Moises.  He pointed at me very close to me

with a very angry face, and he says, that's the way you want it.  And he was very, very,

with a very angry face." (Tr. 526:13-16.) Chef Rotolo said nothing about Ecuador or Mendez's national origin or race during this exchange. (Tr. 783:15-25.)

Mendez testified that he complained about Chef Rotolo's gesture to "two or three" union delegates, as well as to his then-boss, Executive Chef Frank Tujaque. (Tr. 526:23-25.) Kyle Craddock confirmed that he was one of the union delegates to whom Mr. Mendez spoke about the incident. (Tr. 1953:3-8.) Mendez also filed a written complaint with Maria Lavides. (Tr. 528:21-14.) The complaint, which was filed in Spanish, reads: "As you already know, since a long time ago I've been a victim of all kinds of verbal, nonverbal, and written harassment. Today, 6/28/2007, chef Antonio Rotolo continues to practice as he makes gestures with his fingers as if he was shooting a gun showing me a very hostile face. You know Mrs. Maria that I am very sick and I only want to work in peace so that I can provide sustenance to my dear family. I beg that you review my situation and end my suffering that this kind of harassment brings me." (DX 11 (SM_00422).) According to Mendez, no one in management, security or corporate headquarters ever contacted him regarding his complaint. (Tr. 529:25-530:8.)

Kiska testified that Maria Lavides investigated Mendez's complaint (Tr. 1632:16-17) by interviewing Chef Rotolo. (Tr. 1721:22-1722:3). Predictably, Chef Rotolo denied ever having made a gun gesture at Mendez. (Tr. 962:8-11.) Lavides concluded that, "from the way he moved his hands . . . it must have been a misunderstanding in terms of what Mr. Mendez alleged in that written complaint." (Tr. 1722:7-10.)

Mendez testified that he also filed a complaint with the "Ethics Hotline" set up by the hotel, and that he subsequently met with an individual named Tom Mituzas. (Tr. 784:3-13.) At that meeting, Mendez spoke with Mituzas in the presence of a union

22

delegate (Giovanni Toro). (Tr. 784:14-19.) Notes from that meeting were entered into evidence as Defendant's Exhibit 36. (Tr. 786:14-17.) They do not mention the gun gesture to which Mr. Mendez testified.

To summarize, the record revealed three incidents that Mendez perceived as threatening, one in each of the three years prior to the filing of the complaint. In one case, management investigated and concluded that Mendez had overreacted. For two of the incidents there is no evidence of any race or national-origin based motivation whatsoever; in the 2004 incident, the person who uttered the threat referred to plaintiff's country of origin but not in a way that suggests that plaintiff was being threatened because he was from Ecuador.

*E. Vandalism in the Workplace (2007)*

**Mendez's Locker (October 2007)**

Mendez testified that the lock on his locker was damaged in or around October 2007. He filed a report with security regarding the incident. (Tr. 651:1-6; 697:25-198:6 (identifying the date of the security report); 707:17-19 (identifying the date of the incident).) Mendez 'had no idea" who might have damaged his locker. (Tr. 733:1-2.)

Kiska learned about the damage to Mendez's locker from the security department. (Tr. 1433:7-8.) She testified that "a couple" of things struck her about the incident when she read the security report: "That security reported to the scene, they looked at the lock; that the lock was still working; that Mr. Mendez had told security that nothing was missing or tampered with; and that the lock itself was still working." (Tr. 1433:24-1434:3.) She noted that, "Security deemed that there was nothing else to do, that they would close the case. They inspected the lock and the locker and everything was in

working order; and that they informed Mendez that if anything else happens, please come back and see them and they will go back up and do a report." (Tr. 1434:4-8.) Kiska concluded that the marks on Mendez's lock were not the product of an attempt to break into his locker. Nonetheless, she made an appointment to speak with Mendez about the incident. (Tr. 1434:23-1435:23.) According to Kiska, Mendez never showed up for that meeting. (Tr. 1435:16-23.)

Several of Mendez's co-workers in the kitchen, including Ayala and Urrutia, testified that Mendez discussed the damage to his lock with them. (Tr. 182:6-21.) Chef Rotolo also saw the damage to Mendez's lock. (Tr. 956:16-957:12.)

Nothing in the evidence suggested any racial or national origin overtones to this incident.

### Oven (December 2007)

Mendez also testified that someone wrote the words "Sir Moises Miss Baker" on the oven where he worked. Mendez did not see who wrote it. (Tr. 651:14; 733:3-7.) During his deposition, Chef Rotolo testified that Mendez showed him this writing on December 29, 2007; during the trial, Rotolo was unable to verify that date. (Tr. 953:21-955:1.)

Charlie Blanco testified that the writing on Mendez's oven read "Moises Master Baker," and that he did not "know what master baker means." (Tr. 358:4-15.) However, after looking at pictures of the writing on Mendez's oven (PX 96), Blanco conceded that the graffiti read "Sir Moises Miss Baker." (Tr. 381:12-14.)

Again, there is no other evidence tending to suggest that this graffiti was placed on Mendez's oven because he was either Latino or Ecuadorian.

24

*F. Physical Altercations*

**Mark Kleinman (2008)**

In addition to these incidents of verbal harassment, threats and vandalism,

Mendez claimed that he was subject to actual physical harassment on June 13, 2008,

when a co-worker named Mark Kleinman punched him in the face with a salad bowl.

(Tr. 559:7-13; 560:6-16 (describing the bowl).)  Mendez described the incident as

follows: "I was going to my station to start working, sir, and I don't know, out of nowhere

I just see Mark Kleinman holding a steel bowl very close to my face and make a fist.

And he hit me so powerful with the bowl on my left side of my face."  (Tr. 560:8-11.)

Mendez admitted that he did not report the incident the day it happened.

However, a few days later, he gave a written statement about Kleinman's behavior to

Kiska.  (Tr. 561:25-562:15 (indentifying PX 22 as the written complaint Mendez filed).)

Lourdes Shapiro, another HR employee, testified that Mendez "came to my office

and gave me a letter with some statements, and I met with Mr. Mendez" regarding the

incident.  (Tr. 1089:18-19.)  Kiska testified about the investigation HR conducted after

receiving Mendez's complaint.  (Tr. 1478:15 et seq.)  Kiska interviewed both Mendez

and Kleinman, along with "several associates," who were alleged to have been witnesses

to the event.  (Tr. 1479:3-10.)  The witnesses interviewed included two cooks, Daniel

McKinley and Mamadou Bakayoko, and an individual named Ricky Ferraro.  (Tr.

1479:11-1485:25.)

Mendez heard that Kleinman was suspended for one week without pay because of

his involvement in the altercation.  (Tr. 562:16-24.)

**Fernando Tello**

25

Mr. Mendez also testified about a second physical altercation at work, though he provided no date on which the incident occurred: "One day when I was working on my table. After I finish, I always clean my table, so I have a garbage – a garbage can, a big garbage can. And I was cleaning with my towel, and he just appeared from behind and he pushes the garbage can. It was between me and the table, and he just pushes the – kick the garbage can and he pushes me. And he went – he went through when he has plenty of space on my back to go through." (Tr. 539:13-19.) There was no additional testimony about this incident.

In sum, Mendez testified about one physical altercation that was investigated by management; management punished the individual who allegedly hit Mendez. He testified about a second altercation, but could not place it in time and did not indicate that he ever complained about it. No evidence specifically suggested that either incident occurred because of Mendez's race or national origin.

## II.    RETALIATION

As should be apparent from the above, when something happened that Mendez did not like, he complained about it. He believes that Westin "put a hidden camera over my station so – to spy on me" in retaliation for his numerous complaints, including his filings with the New York State Division on Human Rights. (Tr. 554:14-555:24.)

A timeline of the formal complaints Mendez filed is below, and it includes the installation of the camera:

### Timeline of Formal Complaints and Camera Installation

Feb. 27, 2006      Letter of complaint to HR Manager Derrick Carlo regarding
                   harassment and threatening conduct by co-workers (PX 203 (SM_01104))

26

| Apr. 21, 2006 | Police report filed regarding harassment and death threat by Melvin Morales (PX 49) |
| May 5, 2007 | Letter of complaint by Mendez and eight co-workers to HR Department regarding harassment by Fernando Tello (DX 164 (SM_02172)) |
| May 18, 2007 | Starwood Nat'l EthicsPoint Hotline report of complaint regarding "misconduct"/ "possible racial discrimination" (PX 8) |
| May 21, 2007 | Discrimination charge filed with State Division of Human Rights (PX 75) |
| June 28, 2007 | Letter of complaint to Assistant Director of HR Maria Lavides regarding harassment and threats by Chef Rotolo (PX 11) |
| June 28, 2007 | Retaliation charge filed with State Division of Human Rights (PX 76) |
| Aug. 15, 2007 | Retaliation charge filed with State Division of Human Rights (PX 14) |
| Sept. 8, 2007 | Starwood Nat'l Ethics Point Hotline report of complaint regarding "discrimination or harassment" (PX 13) |
| Sept. 11, 2007 | Complaint to Ms. Kiska regarding race/national origin discrimination following vandalism to oven (PX 17) |
| Feb. 6, 2008 | Letter of complaint to HR Manager Derrick Carlo regarding harassment and threatening conduct by co-workers (PX 203 (SM_01104)) |
| Late March 2008 | **Hidden camera is installed and operational for 8 days** |
| May 29, 2008 | The complaint in this action was filed |
| June 17, 2008 | Complaint Letter sent to HR Department regarding being punched in face by Mark Kleinman (PX 22) |

Kiska testified that she made the decision to install a hidden camera in the kitchen in March of 2008 (Tr. 1269:17-20) "to follow up on his [Mendez's] complaints." (Tr. 1270:7.) She testified that she conferred with Union Representative Hazel Hazzard before installing the camera and obtained permission from senior management at the hotel. (Tr. 1455:13-22; 1642:1-1643:25.)

27

Kiska testified that the camera was installed "over the lockers and the oven where he [Mendez] said he was vandalized." (Tr. 1272:19-20.) Urrutia testified that "where the camera was pointed was right at Moises actually because he's secluded away from the main kitchen as far as like a camera and it was on that side." (Tr. 190:3-6.) Blanco testified that the camera was not "right over" Mendez's workstation, but it was nearby. (Tr. 355:12-17.)

The evidence indicated that the camera was operational for just 8 days (see PX 44)—until, as Kiska testified, some cooks in the kitchen found the camera, "reached up and were able to pull part of it out and they pulled some of the wires out." (Tr. 1456:13-15.) Kiska could not recall whether they "were able to take out the whole camera," but noted that "they took out a good part of the camera." (Tr. 1456:13-16.)

Mendez was asked "how did you feel . . . when you learned that there was a hidden camera installed in the kitchen?" (Tr. 556:24-25.) He responded, "I feel that they invaded on my privacy, that they were watching me, that they were spying on me to cause me more harm. They don't investigate my complaints but they were causing me more harm." (Tr. 557:1-4.) This was the only testimony Mr. Mendez gave about any emotional distress or other damage caused by the installation of the camera.

Mendez's expert witness, Dr. Carlos Ortiz, began treating Mr. Mendez in June 2008, after the camera incident. Dr. Ortiz testified that Mendez "was severely depressed, anxious, having a lot of anxiety attacks and he was very upset" (Tr. 817:14-19); and that plaintiff was in a "daily depressed mood. He felt hopeless. He was having anxiety attacks. He felt lethargic." (Tr. 836:17-20.) However, neither Dr. Ortiz nor Mendez's treating physician, Dr. Andrew Chun, testified that Mendez complained of suffering any

28

distress *as a result of the installation of the camera*.  In fact, neither doctor mentioned the

word "camera" at all during his testimony.  Dr. Ortiz's testified about distress Mendez

felt because of "being called names" and having "notes written and left on locker" – all of

which happened *before* the hotel installed a camera above his workstation.  (See, e.g., Tr.

821:18-22; see also Tr. 823:24-824:1; 824:24-825:2; 837:17-18; 825:3-8; 836:15-17).

Dr. Ortiz also testified that Mendez felt humiliated about the placement of homosexual

pornography at his work station.  (Tr. 822:24-824:1.)  Not a scintilla of professional

testimony connected any of Mendez's mental distress to the installation of the

surveillance camera.


## DISCUSSION


I will begin by addressing defendant's motion for judgment as a matter of law and

then turn to the Court's *sua sponte* consideration of whether to order a new trial on the

issues of race and/or national origin discrimination.

## I.    JUDGMENT AS A MATTER OF LAW

### A.    Standard of Review

"If a party has been fully heard on an issue during a jury trial and the court finds

that a reasonable jury would not have a legally sufficient evidentiary basis to find for the

party on that issue, the court may . . . resolve the issue against the party."  Fed R. Civ. P.

50.  In determining whether there was a legally sufficient evidentiary basis for the jury's

conclusion, the Court must "defer[ ] to the jury's assessment of the evidence and all

reasonable inferences the jurors could draw from that evidence," and "may not itself

weigh the credibility of witnesses or consider the weight of the evidence." Meloff v. N.Y. Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001) (internal quotation marks omitted).

"A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." Cross v. N.Y. City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005). "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Id. (citations, alterations, and internal quotation marks omitted).

Defendant has moved for judgment as a matter of law on plaintiff's retaliation claim on four grounds: (1) the secret surveillance of defendant does not constitute retaliation as a matter of law (Def.'s Br. at 5-6); (2) plaintiff's complaints about harassment in the workplace were not protected activity (Def.'s Br. at 6-7); (3) the installation of a hidden surveillance camera and the ensuing surveillance were not sufficiently "serious" to constitute actionable retaliation (Def.'s Br. at 8-9); and (4) plaintiff failed to rebut the Westin's legitimate, non-retaliatory reason for installing the camera (Def.'s Br. at 13-14).

To establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity known to defendants; (2) an employment action that disadvantaged him; and (3) a causal connection between the protected activity and the adverse employment action. Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir. 2008). Once a plaintiff establishes prima facie retaliation,

applying the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>,
411 U.S. 792 (1973), the defendants must come forward with a "legitimate,
nonretaliatory reason for the challenged employment decision." At that point, the burden
shifts back to the plaintiff to demonstrate that defendants' rationale is "merely a pretext
for [the] impermissible retaliation." <u>Cifra v. G.E. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001).

### B.    Adverse Actions

Conduct is actionable as retaliation under Title VII only if it is adverse to the
plaintiff when judged objectively and in the workplace context. <u>See Burlington Northern
and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67-68 (2006). Prior to the Supreme Court's
decision in <u>Burlington</u>, there is little question that the installation of a security camera
and the ensuing surveillance would not have constituted an "adverse action" for
retaliation purposes, since it did not alter any term or condition of plaintiff's employment
(his salary or benefits, job duties, perquisites, etc.). However, in <u>Burlington</u>, the Supreme
Court held that several circuits, including our own Second Circuit, had defined "adverse
action" too narrowly in the context of Title VII retaliation. The Court ruled that Title
VII's "anti-retaliation provision, unlike the substantive provision, is not limited to
discriminatory actions that affect the terms and conditions of employment." <u>Id.</u> at 63-64
(citations omitted). But the Court also held that, "The anti-retaliation provision protects
an individual not from all retaliation, but from retaliation that produces an injury or
harm," <u>id.</u> at 64, so that "a plaintiff must show that a reasonable employee would have
found the challenged action materially adverse, which in this context means it well might
have 'dissuaded a reasonable worker from making or supporting a charge of
discrimination.'" <u>Id.</u> at 68 (quoting <u>Rochon v. Gonzalez</u>, 438 F.3d 1211, 1219 (D.C. Cir.

31

2006) (internal citation omitted)). "Petty slights [and] minor annoyances" in the workplace are not actionable as retaliation. Id.

The standard for what qualifies as an adverse action under the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 et seq. ("NYCHRL"), is substantively identical to the federal standard. Retaliatory conduct under the NYCHRL need "not result in an ultimate employment action," but must "be reasonably likely to deter a person from engaging in protected activity." Id.

Defendant argues that "being surveilled by a hidden camera – simply is not, standing alone, an actionable adverse action either under Burlington or the City HRL." (Def.'s Br. at 9) (citations omitted).) In making this argument, defendant relies in part on an unpublished case from the United States District Court for the District of Connecticut: Billue v. Praxair, Inc., No. 05 Civ. 170, 2007 WL 1231841 (D. Conn. Apr. 26, 2007), which in turn relied on a case from this district—Nicastro v. Runyon, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999)—in which a court had held that "surveillance" and "excessive scrutiny" were not "adverse employment actions," and therefore, could not serve as the basis for a Title VII retaliation claim. Billue, at *7 (citation omitted). Billue was affirmed by the Second Circuit, but by summary order, see Billue v. Praxair, Inc., No. 07 Civ. 2359, 2008 WL 4950991 (2d Cir. Nov. 20, 2008) (summary order); that summary order has no precedential effect on any court, although it has to be deemed some indication of how the Court of Appeals might rule were it to decide the issue in a binding opinion.

The case on which Billue relied—Nicastro v. Runyon—was decided *before* the Supreme Court decided Burlington and significantly expanded the definition of

32

actionable retaliation that had historically been employed in the Second Circuit. After Burlington, Title VII retaliation covers *any* "employer actions that would have been materially adverse to a reasonable employee or job applicant"—not just those actions that are related to employment, like firing or granting leave. Burlington, 548 U.S. at 67. Since Burlington, the Eight Circuit has held that "placing an employee under constant surveillance could be evidence of retaliation." Fercello v. County of Ramsey, No. 09 Civ. 2587, 2010 WL 2945312, at *8 (8th Cir. July 29, 2010) (citation omitted). The Eighth Circuit's holding comports with the plain language of Burlington, in which the Court wrote that an adverse action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citation omitted). For that reason, I do not believe that Billue bars a finding that the secret surveillance of Mendez constituted an adverse employment action.

Neither of the other two cases cited in support of defendant's argument renders its position compelling. Constance v. Pepsi Bottling Co. of N.Y., No. 03 Civ. 5009, 2007 WL 2460688 (E.D.N.Y. Aug. 24, 2007) does not, as defendant states, hold that installation of a hidden camera can never constitute actionable retaliation. Rather, the portion of Constance on which defendant relies states that: "Related to this concern is whether surveillance on the job constitutes an adverse employment action, an issue not raised by defendants. However, *it is questionable under the facts of this case* whether the use of the investigator 'affect[s] employment or alter[s] the conditions of the workplace.'" 2007 WL 2460688, *36 n.15 (emphasis added). Likewise, Scott v. Cellco Partnership, No. 06 Civ. 7245, 2007 WL 1051687 (S.D.N.Y. Apr. 3, 2007), an unpublished disposition from another court in this District, says only that the "excessive

33

scrutiny" plaintiff alleged she received in that case (the nature of which was not specified) was insufficient to state a cause of action under Title VII.  Id. at *3.  There is no mention in the opinion of a camera having been installed over an employee's workstation after he complained repeatedly about discrimination.

Because Kiska's testimony about obtaining the Union's permission before installing the camera was unrebutted, Defendant also cites Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 124-25 (2d Cir. 2008), to argue that an "employer's exercise of rights allowed under [a] labor agreement with respect to handling of discrimination complaints cannot be retaliation," as a matter of law.  (Def.'s Br. at 12.) In Richardson, the Second Circuit was asked to decide whether Title VII "forbids an election-of-remedies provision in a collective bargaining agreement," or "in the alternative, whether adherence to that provision constitutes discrimination."  532 F.3d at 116-17.  The court (Walker, J.) answered both questions in the negative.  The union contract in Richardson had authorized the "adverse" action in that case (adherence to the election-of-remedies clause in the contract).  Richardson followed the Circuit's holding in United States v. N.Y. City Transit Auth., 97 F.3d 672, 677 (2d Cir. 1996), where the Court of Appeals found that "reasonable defensive measures do not violate the anti-retaliation provision of Title VII, even though such steps are adverse to the charging employee and result in differential treatment."  Id. at 677.  Nothing in Richardson suggests that employer action that would deter a reasonable employee from complaining about discrimination is not retaliatory simply because the action was, as defendant argues, an "exercise of rights allowed under a labor agreement."

34

I thus reject Starwood's contention that the installation of a hidden surveillance camera to surveil an employee who has complained of discrimination can never be retaliatory as a matter of law, because surveillance can never be deemed an adverse employment action.

However, the fact that surveillance *can* be an adverse employment action does not mean that it *must* be found to be an adverse employment action. Unless being secretly surveilled for eight days (and so knowing that the employer was keeping an eye on him) "well might" dissuade a reasonable employee from exercising his right to complain about discrimination, the surveillance is not *actionably* adverse, even under Burlington.

I do not doubt that different triers of fact could reach different answers to this question, based on the facts in different cases. The complication we encounter in this case is that Mendez himself was not dissuaded by the secret surveillance from exercising his right to complain about discrimination. He filed his June 17, 2008 complaint with HR concerning the Kleinman incident, and he filed this lawsuit, after he learned that his employer was spying on him.

Of course, in Burlington, the Supreme Court set forth an objective standard – whether the action is one that would likely deter a reasonable employee from exercising his right to complain about discrimination. It did not select a subjective standard – one that focuses on the defendant's actual response to the allegedly retaliatory conduct. However, as the Second Circuit explained in Hicks v. Baines:

> The [Burlington] standard may be objective, but [c]ontext matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. . . . And of course context can diminish as well as enlarge material effect.

35

593 F.3d 159, 165 (2d Cir. 2010) (internal citations and quotations omitted). In several

post-Burlington cases, district courts in this Circuit have granted judgment to an

employer in cases where the employee filed complaints after an allegedly retaliatory act.

For example, in McWhite v. N.Y. City Hous. Auth., No. 05 CV 09912008 WL 1699446,

at *14 (E.D.N.Y. Apr. 10, 2008), the purported retaliation consisted of (1) wrongfully

accusing plaintiff of stealing documents and (2) permitting others to use equipment that

the plaintiff had reserved. Despite these acts, which were allegedly undertaken to

retaliate against the plaintiff, she complained to the EEOC and filed a charge. Judge

Buchwald concluded for this reason that the actions about which plaintiff complained did

not amount to an adverse action.

Similarly, in Vasquez v. Southside United Hous. Dev. Fund Corp., No. 06-CV-

5997, 2009 WL 2596490 (E.D.N.Y. Aug. 21, 2009), Judge Gershon concluded that the

alleged retaliatory comments made by the plaintiff's boss did not rise to the level of a

materially adverse employment action:

> The Burlington Northern inquiry is highly fact-specific. As the Court
> explained, "[c]ontext matters" and "the significance of any given act of
> retaliation will often depend upon the particular circumstances." The
> heart of the inquiry is whether, under the particular circumstances, the
> challenged actions "might have dissuaded a reasonable worker from
> making or supporting a charge of discrimination." Vasquez has presented
> no evidence that Cipriani's comments chilled her support of Bonano, or
> caused her to actually fear reprisal. The supervisor with ultimate authority
> to terminate Vasquez, David Pagan, was not implicated in these threats.
> The courts find that while these comments fit within a pattern of highly
> inappropriate behavior by Ciprian, there is insufficient evidence for a
> reasonable finder of fact to conclude that the comments would dissuade a
> reasonable worker from making or supporting a charge of discrimination.
> In fact, there is no evidence that Ciprian's comments served to dissuade
> Vasquez, as she ultimately filed her own complaint with the Equal
> Employment Opportunity Commission and eventually pursued this action.

Id. at *13 (internal citations omitted).

In both of these cases, the courts concluded that the alleged acts of retaliation were not adverse without regard to the plaintiff's behavior; the fact that, in each case, the plaintiff herself was not deterred was simply icing on the cake. Precisely because Burlington sets an objective standard, subjective evidence about the plaintiff's reaction to the allegedly retaliatory action can never be more than some evidence that the action is not adverse. However, I agree with Judges Gershon and Buchwald that a plaintiff's own behavior in the face of purported retaliation has to be considered as part of the Burlington "context." And in this case, Mendez's post-surveillance behavior cuts against the jury's verdict.

Nonetheless, there is nothing unreasonable about the jury's concluding that secret surveillance by an employer well *might* (which is the phrase used by the Supreme Court used in Burlington) dissuade a reasonable employee from continuing to complain about discrimination – especially in the context of the apparent lack of a sympathetic response from management to complaints. The fact that Mr. Mendez is a strong and resilient man, who has persevered at his job for years despite what must be described as singularly unpleasant working conditions, might well affect his damages (about which more will be said below). But it cannot, without more, defeat his claim for retaliation if the jury concluded (as it did) that reasonable employees who lacked Mr. Mendez's backbone might have been deterred by such surveillance from exercising their rights under Title VII and the NYCHRL.

### C.    No Protected Activity

Defendant's next argument—that Mendez's filing of complaints of discrimination with both the company and the New York State Division of Human Rights was not protected activity—is so obviously silly as to warrant no further discussion.

### D.    Failure to Rebut Legitimate Explanation

Defendant contends that judgment should be entered in its favor because Plaintiff failed to "rebut Defendant's legitimate, non-retaliatory reason for installing the camera." (Def.'s Br. at 13.)  Specifically, Defendant argues that under the Second Circuit's precedent in Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996), Plaintiff failed to come forward with sufficient evidence to rebut the Westin's explanation for the camera – namely, that it was trying to catch the individual who was vandalizing Mendez's locker.  (See Def.'s Br. at 13.)

Van Zant does not carry the day for defendant, because in that case the plaintiff had come forward with *no* evidence to support her contention.  For that reason, the Second Circuit found that "there was no material issue of fact for a jury to consider."  Id. at 714.  Here, there is at least some evidence that supports plaintiff's position that Kiska installed the camera to retaliate for his repeated complaints.  For example, Kiska falsely claimed in correspondence to the union that the camera was installed on April 1, 2008— suggesting that the camera was only operational for one day—when in fact it had been installed earlier, on March 26.  The jury could reasonably have concluded that Kiska's attempted concealment of the duration of surveillance was an attempt to mask her retaliatory intent.  Kiska also testified that the passage of five days or more between an incident and the commencement of an investigation "greatly hinders" that investigation.

(Tr. 1469:25-1470:5.) Nevertheless, the hidden camera—purportedly installed to investigate Mendez's discrimination claims—was not operational until *several months* after Mendez's workstation was vandalized. The jury could reasonably interpret this delay as evidence of pretext. The fact that one witness (Urrutia) testified that the camera was pointed directly at Mendez could suggest that Mendez, rather than his secret tormentor(s), was the target of the surveillance. And while most of plaintiff's complaints were not temporally proximate to the installation of the camera—a point defendant makes (Def.'s Br. at 7)—the sheer number of Mendez's complaints, plus the fact that one of them came very shortly before the camera was installed, overcomes what would otherwise be the presumption in this Circuit that the passage of more than three months between the protected activity and the purported instance of retaliation negates any inference of retaliation.

Finally, it was Kiska who installed the camera and Kiska who explained to the jury why she installed the camera – and as discussed above, Kiska was not the most credible of witnesses. Her handling of employee complaints rendered her testimony questionable. In most instances, Kiska's idea of an investigation was to ask Mendez to identify witnesses who would corroborate his claim. If he could not, Kiska closed the investigation without making more than a cursory effort to interview other employees or further investigate the matter on her own. (See, e.g., Tr. 1223:23-1232:5.) Even when Mendez produced corroborating evidence it was not "evidence;" for example, Kiska testified that her investigation of the alleged physical assault on Mendez by Mark Kleinmann resulted in a determination that Mendez's complaints could not be corroborated by witnesses, although she received a written statement from a co-worker of

Mendez, who recalled seeing Kleinmann with his "fist in the bowl going to smash Moises Mendez a little bit in the face with fist in the bowl." (Tr. 1201:18-1203:11.) The jury could (and obviously did) reasonably find that Kiska's failure to engage in any meaningful investigation of Mendez's many complaints rendered her explanation for why she installed the camera incredible. I cannot fault the jurors for rejecting Kiska's explanation for why she installed the camera, even if I would not have done so myself.

The evidence in support of a finding of retaliation is far from overwhelming. I freely admit that if I were the trier of fact, I would have reached a different result. But it cannot be said that no evidence supports the jury's decision to reject Kiska's explanation for why she installed the camera. Therefore, nothing in <u>Van Zant</u> compels me to grant the motion for JMOL.

### E.    Seriousness

The "seriousness" argument as briefed by Westin does no more than belittle the plaintiff's contention that he was harmed by the installation of the camera. The short answer is that the jury decided that the installation of the camera *was* serious, because it was done for the purpose of retaliating against plaintiff for his many complaints.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

For these reasons the defendant's motion for judgment as a matter of law pursuant to Rule 50 is denied.

## II. REMITTUR

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." <u>Earl v. Bouchard Transp. Co.</u>, 917

40

F.2d 1320, 1328 (2nd Cir. 1990) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2nd Cir. 1984)) (internal quotations omitted). Before a court orders a plaintiff to make this choice, it must first determine whether the verdict is excessive. In a federal question case, as here, if the Court determines the award shocks the judicial conscience, it should remit the jury's award to the maximum amount that would not be excessive. Earl, 917 F.2d at 1330; see also Pescatore v. Pan American World Airways, Inc., 97 F.3d 1, 18 (2nd Cir. 1996).

Defendant argues that if the court denies its motion for judgment as a matter of law, both the compensatory and punitive damages awards granted by the jury must be remitted, because (1) the compensatory damages verdict is excessive (Def.'s Br. at 16-19), (2) plaintiff failed to show malice or recklessness by Westin management, as required before punitive damages may be awarded (Def.'s Br. at 19-23), and (3) even if plaintiff had made such a showing, the punitive damages verdict was "grossly excessive" (Def.'s Br. at 23). I agree with defendant.

While it is properly within the province of the jury to calculate damages, there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2nd Cir. 1961) (citation omitted). Moreover, although a jury has broad discretion to award damages as it feels appropriate, "it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 684 (2nd Cir. 1993) (citation omitted).

41

In this case, I have no difficulty concluding that the jury awarded damages (both compensatory and punitive) on the basis of sympathy, and that they must be substantially reduced.

### A.   Compensatory Damages

Under Title VII, NYSHRL and NYCHRL, a plaintiff's recovery of damages for mental anguish is limited to compensation for actual and proven injury.  In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, "bearing in mind that any given judgment depends on a unique set of facts and circumstances."  Nairn v. Nat'l R.R. Passenger Corp., 837 F.2d 565, 568 (2d Cir.1988).

Courts will often remit "garden variety" non-economic damage awards when evidence of actual emotional injury is limited, and few details of the duration, severity or consequences of the condition are presented.  For example, in Kinneary v. City of New York, 536 F. Supp. 2d 326 (S.D.N.Y.  2008), rev'd on other grounds, 601 F.3d 151 (2d Cir. 2010), the district court held that a $125,000 jury award for non-economic damages was excessive, and remitted the damages award to $25,000.  There, plaintiff was a sludge boat captain who suffered from "shy bladder syndrome."  The condition left him unable to urinate on demand, which eventually led to his termination for failing to submit to a drug test.  After prevailing in his suit against the city for discrimination based on his disability, plaintiff was awarded $100,000 in back pay and $125,000 for emotional distress.

In evaluating the reasonableness of the jury's damage award, the court noted that plaintiff's was a run of the mill mental anguish claim, defined as one where the evidence

is limited to the testimony of the plaintiff and there is little or no medical documentation of any injuries. The court noted that in such cases, awards tend to hover in the range of $5,000 to $30,000," and "emotional damages awards exceeding this range generally involve particularly egregious conduct on the part of defendants, such as deliberate, highly offensive, wanton, or violent actions and threats, or situations where the plaintiff's emotional distress is so severe that he exhibits multiple objective physical manifestations ordinarily substantiated by expert testimony." Id. at 331 (citations omitted). In Kinneary, the court concluded that plaintiff's embarrassment and disappointment over losing his job did not warrant a damages award in excess of $25,000.

Other "garden variety" cases have included the reduction of a $140,000 award to $10,000 where plaintiff was laterally transferred to a job in a less desirable department but retained the same salary and benefits, Reiter v. Metro. Transp. Auth. of N. Y., No. 01 Civ. 2762, 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003) (Koeltl, J.), and the reduction of a $219,428 award to $20,000 where plaintiff suffered from "mental anguish" after being fired in retaliation for complaining of discrimination, McIntosh v. Irving Trust Co., 887 F. Supp. 662 (S.D.N.Y. 1995).

Of course, a court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony. See, e.g., Osorio v. Source Enterprises, Inc., No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007). However, when a court is convinced that the jury's award is entirely out of proportion to the plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remitittur is the appropriate remedy.

43

In this case, there is no evidence—even from plaintiff—that he suffered any

significant damage because of the installation of the camera and the eight days of secret

surveillance that followed. Asked how he felt when he learned about the camera,

Mendez testified that Starwood's invasion of his privacy added insult to the injury of thec

company's refusal to investigate his complaints. But Plaintiff did not attribute

depression, anxiety or any other indicium of non-economic damage to the presence of the

camera or the fact that he was surveilled at work for eight days. Neither of his physicians

attributed any damage to the secret surveillance. As noted above, Plaintiff was not

actually dissuaded from taking steps to protect his rights after he learned about the secret

surveillance. The testimony of Mendez and his doctors simply does not support an award

of $1 million in compensatory damages for the act of retaliation that plaintiff proved.

The court is convinced that the jury felt sorry for plaintiff – as, indeed, the court

felt sorry for the plaintiff. Mendez endured an abusive workplace and got very little

sympathy or assistance from either his employer or his union. The jury concluded that

the hostility in Mendez's work environment was not attributable to any sort of actionable

discrimination, and after reviewing the record, I cannot say that this conclusion was

incorrect (see below). As we all know, Title VII is not a civility code. See Oncale v.

Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998); only discriminatory

harassment can support a viable claim under any anti-discrimination law, including the

HYCHRL. However, a non-discriminatory but uncivil workplace can certainly make a

person miserable. The court is convinced that the jurors concluded that Mendez was

miserable at work, having found some basis on which to hold Westin liable, awarded

damages that were entirely out of proportion to any injury that was or could have been

attributed to the retaliatory surveillance – but  that were perfectly in proportion to the teasing and rudeness Mendez endured at the hands of his fellow workers and his chefs, and to the frustration he felt when his employer and his union failed to respond to his complaints in a way that he found adequate.

This is exactly what the jurors were told they could not do. The jurors were clearly instructed that they could only award non-economic damages that were caused by defendant's *actionable* misconduct—i.e., misconduct that was occasioned by one of the factors prohibited by the various anti-discrimination statutes—and the only *actionable* misconduct they found was the installation of the camera in retaliation for Mendez's complaints. The jury was not permitted to demonstrate its disapproval of conditions in the Westin kitchen by awarding Mendez damages for conduct that had nothing to do with the camera – especially when the jury, after extensive deliberation, concluded that this conduct did not to violate any antidiscrimination law.

In the circumstances, the court remits the award of compensatory damages to $10,000.

### B.    Punitive Damages

The court also remits the jury's award of punitive damages.

Defendant first argues that punitive damages must be dismissed in their entirety because Kiska did not act with the requisite malice or reckless indifference to Mendez's federally protected rights by installing the hidden camera, relying on Kolstad v. American Dental ass'n, 527 U.S. 526 (1999). This argument, which relies on accepting Kiska's testimony, has no merit, because the jury obviously did not accept her testimony.

45

Alternatively, defendant argues that the punitive damage award in this case is excessive, in that it "shocks the judicial conscience." The Court agrees.

In Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996), the Second Circuit held that a trial court "may refuse to uphold a punitive damage award when the amount is so high as to shock the judicial conscience and constitute a denial of justice." To determine whether an award is excessive, the Court must:

> keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future. Thus, [the court's] task is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

Id. at 809 (internal quotations and citations omitted). When deciding whether an award of punitive damages shocks the judicial conscience, a court examines three factors: (1) the degree of reprehensibility of the conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this penalty and comparable penalties authorized by law or imposed by judges and juries. Id. at 809 (citation omitted). After weighing these factors, a court should compare the instant damage award with other awards in comparable cases, Id. at 812, and examine the record to determine whether the award is supported by the evidence. Id. at 813.

In BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996), the Supreme Court identified the first Lee factor—the degree of reprehensibility—as the most important, and said that three aggravators would make some conduct more reprehensible than others. The aggravating factors include: (1) whether the defendant's conduct was violent or threatened violence; (2) whether a defendant acted with deceit or malice and not merely

negligence; and (3) whether a defendant has repeatedly engaged in the misconduct. Id. at 575-76.

The Lee factors do not militate in favor of a $3 million punitive damages award.

Turning to the all-important factor of reprehensibility, there is no evidence in this case of either violence or repeated acts of retaliation by defendant. While it is true that installation of a hidden camera involves an element of deceit, the duration of the surveillance of plaintiff's workplace was brief (eight days), and the actual damage caused by the secret surveillance was miniscule. Also, the fact that plaintiff's union was consulted in conjunction with the installation of the camera undercuts any suggestion of malice.

The second Lee factor fades into insignificance on the peculiar facts of this case. The obviously outsized award of compensatory damages, which led to remitittur, makes the 3:1 ratio between the jury's award of compensatory and punitive damages meaningless. The ratio between the remitted award of $10,000 and $3 million -- 300:1 − is so far out of proportion as to make the award of punitive damages unconstitutionally excessive. In State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408 (2003), the Supreme Court held that a 145:1 ratio was unconstitutional, noting that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425. The Court had previously held that a 4:1 ratio "might be close to the line of constitutional impropriety." Id. (Citing Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991)). While a ratio higher than 4:1 may comport with due process in cases where a particularly egregious act resulted in *nominal* compensatory damages, See Lee at 811, the remitted compensatory damage

47

award of $10,000 in this case is not nominal.[1]  Therefore, I find that the 300:1 ratio

between the $3 million punitive damage award and the $10,000 in compensatory

damages is unconstitutionally excessive.

As for the third Lee factor, it is instructive to look at the civil or criminal penalty

that would be imposed for comparable conduct.  The installation of the hidden camera is

analogous to a violation of New York General Business Law § 395-b, which, *inter alia*,

prohibits a business from installing a video surveillance device in order to surreptitiously

observe a person in a "fitting room, restroom, toilet, bathroom, washroom, shower, or any

room assigned to guests or patrons in a motel, hotel or inn." N.Y. Gen. Bus. Law § 395-

b(2).  Those are places where people engage in deeply private actions that expose the

most private portions of their bodies.  Yet a violation of that law is punishable by no

more than 15 days in jail, and a maximum fine of $300.  Id. § 395-b(5).  A $3 million

award of punitive damages for engaging in secret surveillance in a workplace—which is

a far more public place, but one where an employer has a legitimate right to be present—

is wholly out of line with the punishment that would be imposed for comparable, but

arguably more egregious, conduct.

In short, applying the Lee factors, the award of punitive damages is so excessive

that it shocks the judicial conscience and denies the defendant justice.

The award is shocking for another reason.  This is a rare case in which the court

actually explained to the parties why it was charging punitive damages, and it had

nothing to do with the installation of the camera or the secret surveillance.  I told counsel,

at the charging conference, that the evidence, if believed by the jury, painted a picture of

---

[1] If the Court had remitted damages to $1—which it considered doing—the resulting ratio of 3,000,000:1 would without question be unconstitutional.

a work environment more hostile than in any case the court had ever seen. (Tr. 2420:2-2422:15). If the jury had concluded that the hostility toward the plaintiff was the result of discrimination on the basis of some prohibited factor—whether race, national origin, or disability—then it could rationally have concluded that Mendez's employer should be liable for punitive damages. Such a finding would have been perfectly appropriate in a case where the jurors heard that there was "no evidence" to substantiate Plaintiff's repeated complaints of untoward behavior by the chefs and by his fellow kitchen workers; where Plaintiff's own statements were apparently not deemed to be "evidence" as long as the person who allegedly harassed him denied doing so; and where the HR representatives plainly did not view it as within their province to delve further into such complaints or to resolve discrepancies, but instead automatically gave the denier the benefit of the doubt.

The court never had an opportunity to assess whether it would have submitted the question of punitive damages to the jury if the only issue in the case had been retaliation based on the installation of the camera and the subsequent secret surveillance. I suspect that I would not have submitted the issue to the jury. However, I did not tell the jurors that it could only award punitive damages if they found for the plaintiff on the hostile work environment claim. I must, therefore, respect the jury's determination that Kiska's conduct with respect to the camera was particularly reprehensible. But that does not mean I can sustain the amount of punitive damages that the jurors assigned to her conduct.

For the reasons explained above, the punitive damage award is remitted to $300 – the maximum fine available for a single violation of New York's "secret surveillance" law .

### III.   MOTION FOR NEW TRIAL

#### A.   Standard of Review

Federal Rule of Civil Procedure 59 provides that a Court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Granting a new trial is appropriate where "the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and citations omitted).  "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998).

#### B.   Discussion

On April 26, 2010, the Court alerted the parties to the possibility that it might *sua sponte* order a new trial on the issues of race and national origin discrimination (but not disability discrimination).  I had a very strong reaction to the testimony at trial and I wanted an opportunity to review the record at length, in order to ascertain whether the

jury had reached a seriously erroneous result on plaintiff's claims of racial/national origin discrimination.[2]

Having conducted that review, I cannot say that the jury reached a seriously erroneous result, or that its verdict is a miscarriage of justice. Therefore, I am not ordering a new trial on the issue of hostile work environment based on race or national origin discrimination.

Title VII provides, in relevant part, that "It shall be unlawful for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted Title VII to reach, among other conduct, "requiring people to work in a *discriminatorily* hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (emphasis added). This particular form of harassment is actionable "when the workplace is permeated with *discriminatory* intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (citations and internal quotation marks omitted; emphasis added).

While there is no bright-line test about what type of conduct is required to give rise to a hostile work environment claim against an employer, courts should consider the following non-exclusive factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

---

[2] While the court's *sua sponte* order was motivated principally by its own reaction to the evidence, the verdict sheet revealed that the jurors originally found in plaintiff's favor on the issue of hostile work environment, but then unanimously changed their minds on the issue. A copy of the relevant pages of the verdict sheet is attached to this opinion. The jury's change of heart played some part in my thinking.

51

utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 22-23. As a general matter, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." Tomka v. Seiler Corp., 66 F.3d 1295, 1305 n. 5 (2d Cir. 1995) (citations omitted); see Carrero v. N.Y. City Hous. Auth., 890 F.2d 569, 577-78 (2d Cir. 1989) (to be actionable, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). However, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition: "[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." Tomka, 66 F.3d at 1305 (emphasis added; footnote and citations omitted).

I begin by acknowledging what had to be obvious to anyone who sat through the trial: the kitchen at the Westin Hotel can be a most unpleasant place to work. Among plaintiff's supervisors and employees are mean-spirited individuals, who have no compunction about picking on those who are perceived as weak. Insults and teasing are commonplace – several employees credibly testified as much. And management is largely unsympathetic. In that sense—in the "incivility" sense—the kitchen at the Westin could certainly feel "hostile."

However, to be *actionably* hostile, a workplace must be rendered hostile by workplace-altering conduct attributable to some statutorily prohibited factor (race and national origin are the relevant factors for our purposes here) – not simply incivility or

52

nastiness. When we say that Title VII, and corresponding state and local laws, are not a civility code, See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998), we are saying even if mean-spiritedness or bullying render a workplace environment abusive, there is no violation of the law unless that mean-spiritedness or bullying is rooted in race or national origin discrimination. An abusive workplace that is not discriminatory does not violate the law. For purposes of this case, harassment at the Westin that was not based on Plaintiff's race or national origin is not illegal, even if it was offensive.

Furthermore, a hostile work environment is one that so that is *so permeated* with discriminatory insult and ridicule (i.e., insult and ridicule that violates Title VII and corresponding state and local statutes) that it alters the work environment, rendering it abusive. Incidents of discriminatory intimidation, ridicule and insult have to be sufficiently continuous and concerted that they could be called pervasive. While there is no minimum number of incidents or any rigid formula for determining pervasiveness, isolated remarks or occasional episodes of harassment are not enough to create a hostile work environment. Jurors (including the jurors in this case) are told to ask themselves: How frequent was the behavior? How severe was it? Was it physically threatening or humiliating? Did it consist only of offensive remarks? Did the behavior unreasonably interfere with an employee's work performance?

The court's review of the record is summarized above. Ridicule and harassment were unquestionably pervasive, but only a handful of incidents over a period of four years could even arguably be attributed to plaintiff's protected status as a Latino or a native of Ecuador. Viewing the evidence most favorably to plaintiff, he was called offensive names

53

with an Ecuadorian or Latino twist on an unspecified number of occasions by Charlie

Blanco or by various co-workers, like Kyle Craddock and Anthony Monetta. There was

little or no evidence about when or how often these name-calling incidents took place.

Some of the specific name-calling incidents about which plaintiff testified were overtly

racial in nature, but some were not. Plaintiff's co-workers (especially, it seems, other

Hispanics) repeatedly called Mendez by various sexual or scatological names (faggot,

prostitute), but there was absolutely no evidence that those remarks were predicated on

either plaintiff's race or his national origin. In fact, there is evidence that these and similar

terms were used often in the kitchen, by numerous persons and without regard to a person's

race or background. This undercuts plaintiff's contention that he was subjected to verbal

harassment *for a reason prohibited by law*.

The same is true of the several discrete instances when plaintiff was the recipient of

pornography at his work station. The offensiveness of such incidents is patent, but there is

no evidence that Mendez was singled out for the receipt of pornography because of his race

or his national origin – except in one instance, when references to plaintiff's origins were

written in an offensive manner on the picture.

The other matters about which plaintiff testified were highly sporadic:

- ■ two instances when notes containing overtly racist statements were left
    where plaintiff would find them ( three notes in January 2005 and one note in
    June 2007),

54

- ■ Three threats over a span of four years, (one in 2004, one in 2006, one in 2007 ),

- ■ the damage to plaintiff's locker, and

- ■ the Kleinman assault.

Neither the damage to plaintiff's locker nor the Kleinman assault had any racial or nationalistic overtone to it; there is no evidence at all that either incident was motivated by race or national origin. Neither is there any evidence that the perceived "threats" in 2006 and 2007 were motivated by plaintiff's race or national origin. Put more positively, only (1) the notes left in plaintiff's locker in January 2005 and June 2007 and (2) Francisco Rodriguez's threatening behavior, which took place in 2004, could be ascribed to racial or ethnic prejudice.

Looking at the record in its entirety, and solely with a view to whether the testimony demonstrates a severe and pervasive pattern of hostility to plaintiff *based on his race or national origin*, the court is simply not convinced that the jury's verdict worked a substantial miscarriage of justice.

I was horrified during the trial by the very factors that appear to have driven the jury's irrationally high award of damages for a single incident of retaliation that caused plaintiff only negligible injury – the obvious incivility and offensiveness that were rampant in Mendez's workplace, and what I perceived as management's lack of diligent inquiry into his complaints. Nonetheless, it would be wrong for me to set aside the jury's considered conclusion—reached, as the verdict sheet reveals, after consideration and reconsideration of the evidence—that much of the abuse of plaintiff was not directed at him because of his race or nationality, and/or that the incidents of demonstrably anti-Hispanic/Latino or anti-

55

Ecuadorian prejudice were not sufficiently severe or pervasive to create an actionably hostile work environment.

## CONCLUSION

Defendant's motion for judgment dismissing the retaliation claim as a matter of law is denied. Defendant's motion for a new trial on the issue of retaliation is granted unless plaintiff accepts compensatory and punitive damages in the remitted amounts. Plaintiff has 14 days from the date of this order to make an election. The verdict returned by the jury otherwise stands.

Plaintiff's counsel has made a motion for an award of attorneys' fees. In view of the disposition of the remittitur motion, that motion is denied as moot, without prejudice to renewal (1) if the plaintiff accepts the remitted amounts; or (2) if plaintiff prevails at the retrial of the retaliation claim. Any renewed motion should reflect the fact that plaintiff can only recover attorneys' fees for work performed on claims on which he prevailed – not for work performed in connection with claims on which he did not prevail.

The Clerk of the Court is directed to close the motions at Docket # 117 and 121 and to strike them from the court's list of open motions.

Dated: September 29, 2010

_____
                                    U.S.D.J.

BY ECF TO ALL PARTIES.

**SECTION II.**        **Hostile Work Environment Employment Discrimination**

2-A.   Did plaintiff prove by a preponderance of the evidence that defendant subjected him to a hostile work environment, by subjecting him to discriminatory intimidation, ridicule and insult as a result of his membership in a protected group?

YES ___✗___        NO ___✓___

IF YOUR ANSWER TO QUESTION 2-A IS "YES," ANSWER THE NEXT THREE QUESTIONS (2-B, 2-C, 2-D); OTHERWISE PROCEED TO SECTION III OF THIS VERDICT SHEET.

2-B.   What prohibited factor or factors were the basis on which defendant subjected plaintiff to a hostile work environment?

☐   Race (Hispanic)

☐   National Origin (Ecuadorian)

☐   Disability (Diverticulitis)

2-C.   Was plaintiff subjected to a hostile work environment by supervisory employee(s) at the Westin Times Square?   YES ✗   NO___

2-D.   Was plaintiff subjected to a hostile work environment by co-worker(s) at the Westin Times Square?   YES ✗   NO___

IF YOUR ANSWER TO QUESTION 2-D IS "YES," ANSWER THE NEXT QUESTION (QUESTION 2-E); OTHERWISE PROCEED TO QUESTION 2-F.

2-E.   Did defendant prove by a preponderance of the evidence *all* of the following:

(1)   Starwood had a meaningful and responsive procedure for investigating complaints of discrimination;

(2)   Starwood effectively communicated a firm policy against discrimination to its employees;

(3)   Starwood had a program to educate employees about discrimination under city, state and federal law;

(4)   Starwood had procedures for the supervision of employees specifically directed at preventing and detecting of discriminatory practices; and

(5)   Starwood had a record of no, or relatively few, prior incidents of discriminatory conduct by the employees who subjected plaintiff to a hostile work environment?

YES_____   NO ___✗___

3

2-F.   Was the hostile work environment to which plaintiff was subjected severe or pervasive on the basis of:

    (1)  race?             YES___    NO___

    (2)  national origin?   YES___    NO___

    (3)  disability?      YES___    NO___

ANSWER THE NEXT QUESTION (QUESTION 2-G) <u>ONLY</u> IF YOU ANSWERED "YES" TO ANY PORTION OF QUESTION 2-F; OTHERWISE, PROCEED TO SECTION III.

2-G.   Did defendant prove by a preponderance of the evidence *all* of the following:

    (1)    Starwood had an anti-discrimination policy;

    (2)    plaintiff knew about the policy; and

    (3)    plaintiff unreasonably failed to avail himself of the complaint procedures set forth in the policy?

    YES__X__        NO_____

THE DEFENDANT IS LIABLE TO PLAINTIFF IF:

(I)    YOU ANSWERED "YES" TO QUESTIONS 2-A <u>AND</u> 2-C; <u>OR</u>

(II)    YOU ANSWERED "YES" TO QUESTIONS 2-A, "NO" TO QUESTION 2-C, "YES" TO QUESTION 2-D, <u>AND</u> "NO" TO QUESTION 2-E; <u>OR</u>

(III)    YOU ANSWERED "YES" TO QUESTIONS 2-A, "YES" TO ANY PORTION OF 2-F, <u>AND</u> "NO" TO QUESTION 2-G.

***PROCEED TO SECTION III OF THIS VERDICT SHEET***

4